IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SOJOURNER-DOUGLASS
COLLEGE,

    *Plaintiff*,

v.

MIDDLE STATES ASSOCIATION
OF COLLEGES AND SCHOOLS,
d/b/a      MIDDLE      STATES
COMMISSION     ON     HIGHER
EDUCATION

    *Defendant*.

Civil Action No. ELH-15-01926

## MEMORANDUM OPINION

This suit arises as the latest step in the multi-year effort of plaintiff, Sojourner-Douglass

College ("College" or "SDC"), to secure continued accreditation from defendant, the Mid-

Atlantic Region Commission on Higher Education, doing business as Middle States Commission

on Higher Education ("Commission," "MSCHE," or "Middle States").  ECF 2.[1]  "Accreditation

means the status of public recognition that an accrediting agency grants to an educational

institution or program that meets the agency's standards and requirements."  34 Code of Federal

Regulations ("C.F.R.") § 602.3.

Pursuant to federal law, the "accreditation process operates as an instrument of quality

control on educational institutions."  *Professional Massage Training Center, Inc. v.*

*Accreditation Alliance of Career Schools and Colleges*, 781 F.3d 161, 171 (4th Cir. 2015).

"[A]mong other things," accreditation "entitles educational institutions to access Title IV federal

---

[1] The Commission states that it is "improperly identified in the caption" of the suit as the
Middle States Association of Colleges and Schools.  ECF 38.

student aid funding." *Id.* at 167.  As discussed, *infra*, only students who attend institutions accredited by accrediting agencies are eligible for federally subsidized loans and federal grants.

The College's finances depend largely on tuition revenue.  And, because more than 80% of SDC's students rely for their tuition on federal loans and grants, for which accreditation is a prerequisite, the College's continued existence depends upon the Commission's favorable accreditation decision.

On November 18, 2011, Middle States informed the College that its accreditation was at risk, due in part to concerns about the College's finances that surfaced during a regular, periodic review.  Between November 2011 and November 2014, a representative of the Commission visited the College twice to assist the College with the review process; representatives visited three times to evaluate the College's compliance with the Commission's standards; and the parties exchanged more than a dozen written assessments.  On November 20, 2014, the College appeared before the full Commission—consisting of more than twenty volunteer commissioners—to make its case for continued accreditation.

On November 21, 2014, Middle States informed the College that, effective June 30, 2015, it would withdraw the College's accreditation, due wholly to concerns about the College's financial viability and sustainability.  SDC noted an appeal and, on February 2, 2015, the College appeared before a three-person appellate panel (the "Panel"), challenging the Commission's November 2014 decision to withdraw accreditation.  On February 10, 2015, the Panel affirmed the Commission's decision.

Although the College knew since at least February 10, 2015, that it faced the loss of accreditation on Tuesday, June 30, 2015, it waited until approximately 10:30 p.m. on Monday,

June 29, 2015, to file suit—just hours before the Commission's accreditation decision was to go into effect.  *See* ECF 2.

The College alleges, *inter alia*, that the Commission "has proceeded in an arbitrary and capricious manner in deciding to withdraw the accreditation of the College . . . , in the absence of standards allowing the accrediting agency . . . to reject out of hand any demonstration offered by the College to justify the retention of its accreditation."  ECF 2 at 2.  According to the College, the Commission's actions violated federal common law due process (Count I).  *Id.*  It further alleges breach of contract (Count III) and negligence (Count IV), as well as violation of the Civil Rights Act of 1867, codified at 42 U.S.C. § 1981, for "discrimination in the enforcement of contract" (Count II).   *Id.*   Along with its Complaint, SDC filed an "Emergency Motion for Temporary Restraining Order" ("TRO Motion," ECF 1), as well as a memorandum of law (ECF 1-1, "Memo"), and eighteen exhibits.  ECF 1-2 through ECF 1-19.[2]

On June 30, 2015, the Court held an emergency hearing on the Motion, attended by counsel for both sides.  ECF 7.[3]   After argument, I issued an oral ruling denying plaintiff's TRO Motion.  *See* ECF 14 (transcript of TRO hearing) at 69-84; *see also* ECF 6 (Order).

---

[2] As discussed, *infra*, the College also claimed that the Commission's decisionmaking was the result of racial bias.  *See*, *e.g.*, ECF 1-1 at 2, 5-6, 8 (alleging, *inter alia*, that "predominantly White Institutions" received more favorable treatment from MSCHE); ECF 1-17 (supporting affidavit); ECF 11 at 1 (relying on ECF 1-1 and 1-17).  Indeed, SDC's allegations of racial discrimination permeated SDC's claims, and played a significant part in the Court's decision to hear the Commission's testimonial defense of its decision, beyond the administrative record itself.  But, during closing arguments on August 17, 2015, the College abandoned this contention with respect to Count I.

[3] Notice of the suit and the TRO Motion were provided to defendant mid-day on June 30, 2015, after the Court advised counsel for plaintiff that, under Fed. R. Civ. P. 65, it was obligated to attempt to provide notice.  *See* ECF 4.

The College filed a Motion for Preliminary Injunction on July 3, 2015 (ECF 11, "PI Motion"), which is pending.   In support of its Motion, the College relies on the same legal memorandum (ECF 1-1, "Memo") that it submitted with its TRO Motion.   *See* ECF 11-1 (referring the Court to ECF 1-1).   It also submitted two new declarations, with ten attachments. *See* ECF 11-2 through ECF 11-13.   The Commission opposes the Motion.   *See* ECF 32 ("PI Opposition").   It submitted fifteen exhibits and eight attachments.   *See* ECF 15-2 through ECF 15-24.   The College has replied.   ECF 16 ("PI Reply").

The Court held evidentiary hearings on the PI Motion on July 14, 2015, July 17, 2014, and July 20, 2015, and heard argument on August 17, 2015.   *See* ECF 20, ECF 25, ECF 29, ECF 46.[4]   I will refer to these sessions collectively as the "Motion Hearing."   At the Motion Hearing, each side presented witnesses as well as exhibits.   The Commission's exhibits included the "Record of Appeal," consisting of approximately 3500 pages.   *See* Def.'s Ex. 45.[5]

---

[4] The transcript of the final day of the hearing, August 17, 2014, was not filed as of the date of this Memorandum Opinion.   Therefore, where necessary, I have relied on my notes.

[5] As I indicated to counsel at the outset of the proceedings, ECF 44 at 2-5, I am aware of the Fourth Circuit's admonition in *Professional Massage*, *supra*, 781 F.3d at 172, with respect to the scope of review of an accreditation dispute.   At the start of the Motion Hearing, I reminded the parties that they would not be permitted to re-litigate the Commission's decision.   *See* ECF 44 at 2-5.   Nonetheless, in light of SDC's allegations of racial bias; the length of the administrative record; the benefit to the Court from an explanation of the accreditation process; and the need to consider harm to SDC and the public interest in deciding the PI Motion, I agreed to hear evidence from the parties.   Specifically, I heard evidence pertaining generally to Middle States' accreditation process, its dealings with SDC prior to the Commission's final decision, and the bases for its decision.   As discussed, *infra*, I have not considered any evidence that the parties submitted that was not relevant to these points, and/or that was not before the Commission at the time of its decision.

The Record of Appeal was the subject of consideration by the Panel.[6]   Many of the exhibits submitted during the Motion Hearing or with the parties' memoranda are also contained in the Record of Appeal.   However, as discussed, *infra*, the parties also presented exhibits that were not before the Commission when it decided to withdraw plaintiff's accreditation, nor were they before the Panel.   Although plaintiff submitted evidence that was not presented to the Commission, it has objected to certain exhibits offered by the Commission that are outside of the administrative record and which were not before the Commission when it withdrew SDC's accreditation.

After the evidentiary submissions, each party submitted proposed Findings of Fact and Conclusions of Law.   *See* ECF 34 (SDC's submission); ECF 38 (Commission's submission). The College also replied to the Commission's submission.  *See*  ECF 39.

Also pending is a "Motion to Dismiss Counts II and III of Plaintiff's Complaint" (ECF 27, "MTD"), filed by the Commission on July 21, 2015.  The College opposes the MTD (ECF 40, "MTD Opposition"), and the Commission has replied.  ECF 45.[7]

The motions have been fully briefed.  For the reasons that follow, I will deny the PI Motion, and I will grant the MTD, with leave to amend.

---

[6] Although the "Record of Appeal" is extensive, it was not the only material before the Panel.  For example, the Commission's decision to withdraw SDC's accreditation, some written communications between the Commission and SDC, and some internal Commission memoranda are not part of the Record of Appeal.  However, these materials were available to the Panel.  *See* Motion Hearing, Testimony of Joseph Bascuas, Panel Chair, ECF 47 at 139.  And, these materials are part of the administrative record.

[7] At the request of plaintiff's counsel, the Court did not hear oral argument on August 17, 2015, as to the MTD.  At that time, the College's attorney preferred to focus on the PI Motion. However, no hearing is necessary to decide the MTD.  Local Rule 105.6.

# I. Factual Background

## A. The College

According to Charles Simmons, Ph.D., the President of SDC, the College "is a private independent 501(c)(3) institution that offers Baccalaureate and Masters Degrees with a focus on the Applied Arts and Sciences." Declaration of Charles Simmons ("Simmons Decl."), ECF 1-2 ¶ 4. The school was founded in 1972 as a branch of Antioch College, in order to "serve the African-American community by working toward community self-reliance and provide a 'culturally pluralistic learning environment.'" *Id.* In 1980, the College "became an independent institution under Maryland law." *Id.* ¶ 5. Dr. Simmons has been President of SDC since it "spun off" from Antioch College in 1980. Motion Hearing, Testimony of Charles Simmons, ECF 44 at 6.

SDC's student body is "predominantly African-American," *id.*, and the average age of its students is thirty-eight. *Id.* Dr. Simmons asserts that the College plays a role "as a vital institution in a community of people still marginalized in a larger society that continues to this day to operate in the false belief that it offers equal opportunity to this same group of people who continue to be marginalized." Supplemental Declaration of Charles Simmons ("Supp. Simmons Decl."), ECF 11-2 ¶ 3. Because "the College conceived its focus on the adult student looking to enhance his or her educational profile in the least amount of time, [the College] offered a program of study in which a student could complete a 4-year program in 3-years of study," by completing three semesters each year. Simmons Decl., ECF 1-2 ¶ 6.

The College's "main campus is located in East Baltimore and it has six other centers in Maryland located in Annapolis, Calvert [County], Cambridge, Salisbury, Prince George's' [sic]

and Baltimore counties." *Id*. ¶ 5.  The College also has a "fully accredited campus in Nassau, Bahamas." *Id*.  "At the height of its growth, in 2010," the College "enjoyed its largest student population of about 1,400 students." *Id*. ¶ 6.  For a variety of reasons, when SDC filed its PI Motion, it expected to enroll only about 300 students for its next semester, *i.e.*, the Fall of 2015, "including nearly 100 students who will be entering the final semester of their studies … ." *Id*. ¶ 27.  (As stated *infra*, in November 2014, when the Commission determined that it would withdraw SDC's accreditation in June 2015, the Commission directed SDC to help its current students transfer or transition to other institutions of higher education.  SDC also attributes the decline in enrollment to other conduct of the Commission.)  The Fall 2015 semester was scheduled to begin in late July. *Id.* ¶ 8.

## B.  Federal Tuition Subsidies and Accreditation Requirements

"[N]early all" of the College's students "depend on grants and loans provided through the federal student aid programs pursuant to Title IV of the Higher Education Act of 1965 [("HEA")], as amended, 20 U.S.C. §§ 1070, et seq. [("Title IV")] … to pay for their education … ." ECF 1-2 ¶ 7.  In turn, "at least 80% of the College's tuition revenue is derived from this funding … ." *Id*.

In order for a higher education student to qualify for the receipt of any "grant, loan, or work assistance" under Title IV, a student must be "enrolled or accepted … in a … program … leading to a recognized … credential at an institution of higher education that is an *eligible institution* in accordance with [the HEA]." 20 U.S.C. § 1091 (emphasis added).  "In order to be an eligible institution," a school must "enter into a program participation agreement" with the Secretary ("Secretary") of the U.S. Department of Education ("USDE" or "Department").  20

U.S.C. § 1094(a).   The participation agreement "shall condition the initial and continuing eligibility of an institution to participate" on a number of requirements, including the following, *id.*: "(21) The institution will meet the requirements established by the Secretary and accrediting agencies or associations … ."

The Fourth Circuit has explained that, through the HEA, Congress has effectively "delegated to accreditation agencies a decisionmaking power that affects student access to federal education funding." *Professional Massage*, *supra*, 781 F.3d at 170.   Because accreditation "is a prerequisite to Title IV funding," the process "provides assurance that the federal loans and grants are awarded to students who will get the education for which they are paying." *Id*.

Under the framework established by Congress in the HEA, the Secretary "recognizes" "reliable" accrediting agencies, and the accrediting agencies, in turn, "accredit" institutions of higher education.   The Secretary recognizes an accrediting agency as a "reliable authority as to the quality of education or training offered" by a school when it meets criteria set forth in 20 U.S.C. § 1099b and in the Code of Federal Regulations, at 34 C.F.R. §§ 602 *et seq.*   The agencies "conduct accrediting activities through voluntary, non-Federal peer review," *id.* § 602.3, and establish their own accreditation standards and requirements, *see*, *e.g.*, *id.* § 602.16, within the bounds set by the Secretary and Congress.   For example, the Secretary's criteria for recognition of an accrediting agency as a reliable authority require that an agency's own standards "address the quality of the institution" seeking accreditation in a variety of "areas," including "[f]iscal and administrative capacity as appropriate to the specified scale of operations." *Id*. § 602.16(1)(v).

Of particular relevance here, the Secretary's criteria also circumscribe an agency's protocols for enforcing its own standards, *id.* § 602.20, and for ensuring that "the procedures [an agency] uses throughout the accrediting process satisfy due process." *Id*. § 602.25.

Title 34 C.F.R. § 602.20, on "Enforcement of standards," is pertinent.  It states:

(a) If the agency's review of an institution or program under any standard indicates that the institution or program is not in compliance with that standard, the agency must—

> (1) Immediately initiate adverse action against the institution or program; or
>
> (2) Require the institution or program to take appropriate action to bring itself into compliance with the agency's standards within a time period that must not exceed—
>
> ***
>
> > (iii) Two years, if the program, or the longest program offered by the institution, is at least two years in length.

(b) If the institution or program does not bring itself into compliance within the specified period, the agency must take immediate adverse action unless the agency, for good cause, extends the period for achieving compliance.

Section 602.3 of Title 34 of the C.F.R. defines "adverse action".  It means "the denial, withdrawal, suspension, revocation, or termination of accreditation or preaccreditation, or any comparable accrediting action an agency may take against an institution or program." *Id*.

As noted, SDC complains that it was not afforded due process in the accreditation process.  Because of the allegations, I have set forth below the way in which the Secretary has said that an "agency meets" the requirements of due process.  Section 602.25 of Title 34 of the C.F.R. states that due process is met "if the agency does the following," *id.*:

(a) Provides adequate written specification of its requirements, including clear standards, for an institution or program to be accredited or preaccredited.

(b) Uses procedures that afford an institution or program a reasonable period of time to comply with the agency's requests for information and documents.

(c) Provides written specification of any deficiencies identified at the institution or program examined.

(d) Provides sufficient opportunity for a written response by an institution or program regarding any deficiencies identified by the agency, to be considered by the agency within a timeframe determined by the agency, and before any adverse action is taken.

(e) Notifies the institution or program in writing of any adverse accrediting action or an action to place the institution or program on probation or show cause. The notice describes the basis for the action.

(f) Provides an opportunity, upon written request of an institution or program, for the institution or program to appeal any adverse action prior to the action becoming final.

> (1) The appeal must take place at a hearing before an appeals panel that—

>> (i) May not include current members of the agency's decision-making body that took the initial adverse action;

>> (ii) Is subject to a conflict of interest policy;

>> (iii) Does not serve only an advisory or procedural role, and has and uses the authority to make the following decisions: to affirm, amend, or reverse adverse actions of the original decision-making body; and

>> (iv) Affirms, amends, reverses, or remands the adverse action. A decision to affirm, amend, or reverse the adverse action is implemented by the appeals panel or by the original decision-making body, at the agency's option. In a decision to remand the adverse action to the original decision-making body for further consideration, the appeals panel must identify specific issues that the original decision-making body must address. In a decision that is implemented by or remanded to the original decision-making body, that body must act in a manner consistent with the appeals panel's decisions or instructions.

> (2) The agency must recognize the right of the institution or program to employ counsel to represent the institution or program during its appeal,

including to make any presentation that the agency permits the institution or program to make on its own during the appeal.

(g) The agency notifies the institution or program in writing of the result of its appeal and the basis for that result.

(h)(1) The agency must provide for a process, in accordance with written procedures, through which an institution or program may, before the agency reaches a final adverse action decision, seek review of new financial information if all of the following conditions are met:

> (i) The financial information was unavailable to the institution or program until after the decision subject to appeal was made.

> (ii) The financial information is significant and bears materially on the financial deficiencies identified by the agency. The criteria of significance and materiality are determined by the agency.

> (iii) The only remaining deficiency cited by the agency in support of a final adverse action decision is the institution's or program's failure to meet an agency standard pertaining to finances.

(2) An institution or program may seek the review of new financial information described in paragraph (h)(1) of this section only once and any determination by the agency made with respect to that review does not provide a basis for an appeal.

In sum, to ensure due process, the Code of Federal Regulations requires accrediting agencies to set clear standards; identify deficiencies at particular institutions in writing; provide those institutions with an opportunity to respond and comply within a reasonable time frame, set by the agency; permit appeal to an independent panel; on appeal, permit introduction of significant and material information relevant to an institution's finances, if the institution is threatened with adverse action solely on account of its finances, and the financial information was not available to the institution after the accreditation decision that led to the appeal; and the appeal panel transmits its final decision, with reasons, in writing.

Of relevance here, the Commission's requirements for affiliation and standards for accreditation are published in a seventy-five page document titled "Characteristics of Excellence in Higher Education: Requirements of Affiliation and Standards of Accreditation."  Motion Hearing, Def.'s Ex. 47 ("Standards Guide").  In total, there are ten "Requirements of Affiliation," *id.* at xii, and fourteen "Standards for Accreditation."  *Id.* at ix-xi.  These are discussed, *infra*.

### C. The Commission and Accreditation Procedures

Since 1952, "The Commission has been recognized by the U.S. Department of Education as the regional accreditation agency for institutions of higher education in Delaware, the District of Columbia, Maryland, New Jersey, New York, Pennsylvania, Puerto Rico and the U.S. Virgin Islands . . . ."  PI Opposition, ECF 15 at 5.  The Commission describes itself as "the USDE's gatekeeper."  *Id.*; *see also* Motion Hearing Testimony of Elizabeth Sibolski ("Sibolski Testimony"), ECF 44 at 59-60.  According to Elizabeth Sibolski, Ph.D., the President of the Commission, *id.* at 55-56, there are "534 member and candidate institutions" in the Commission's region.  *Id.* at 57.  The Commission does not receive federal funding of any sort, *id.* at 78, but its members pay dues to the Commission.  *Id.* at 58.  However, there is no written membership agreement.  Instead, there is "an understanding that the institutions that are part of the Commission will abide by .... the policies and the standards of the Commission."  *Id.* at 77.  These policies and standards are published.  *See* Motion Hearing, Def.'s Ex. 47.

Middle States is comprised of twenty-six volunteer Commissioners, some of whom are "representative of faculty and administration" at institutions of higher education, ECF 44 at 58, and some of whom are "public members ... not directly involved in a higher education institution

currently." *Id*. at 59.  The Commissioners are elected by the Commission's member institutions. *Id*. at 69.  There are also "several thousand peer reviewers" the Commission may call upon, *id*. at 58, including the Commissioners, who also serve in that role. *Id*. at 68.  In addition, there is a "modest professional staff that is used to facilitate the work of accreditation."  *Id*. at 56.

The Commission's staff members do not make accreditation decisions.  *Id*. at 58-59, 65. Rather, the peer reviewers "are the folks that are sent out to do … reviews" and evaluations, *id*. at 58, and "it is the responsibility of those volunteers to render the decisions about an individual review of an institution, all the way up through the Commission making the final decision on accreditation." *Id*. at 59.

Institutions apply for accreditation from the Commission by completing an accreditation process. *See id*. at 62.  Initially, an institution must "demonstrate that, within a candidacy period, it has the capacity to come into compliance with all of" the Commission's "standards and requirements." *Id*.  The Standards Guide (Def.'s Ex. 47) explains: "To be eligible for Candidacy status, Initial Accreditation or Reaffirmation of Accreditation, an institution must demonstrate that it meets or continues to meet the … Requirements of Affiliation … .  Once eligibility is established, institutions then must demonstrate that they meet the standards for accreditation." *Id*. at xii.

After the initial application, the process begins in earnest with an institution's self-study report to the Commission.  Sibolski Testimony, ECF 44 at 62.  The institution is then visited by a peer evaluation team, *id.*, which in turn prepares an assessment of the institution's compliance with the Commission's standards for accreditation.  *Id*. at 63.  The institution has an opportunity to respond in writing to the team's report.  *Id*. The reports are then reviewed by a "standing

committee of the Commission … ." *Id*. "The evaluation committee may either uphold the decisions that the evaluation team … made," or it can modify the decision. *Id*. Finally, the reports and recommendations are forwarded "to the Commission for a final decision." *Id*. The Commission's accreditation process largely tracks the requirements for "Application of standards in reaching an accrediting decision," established by the Secretary at 34 C.F.R. § 602.17.

Once an institution achieves accreditation, the Commission continues to review its accreditation through what Dr. Sibolski referred to as a "decennial review" cycle. *Id*. at 65. *See also* 34 C.F.R. § 602.19 (requiring agencies to "reevaluate, at regularly established intervals, the institutions it has accredited"). The decennial review process is very similar to the initial accreditation process.

"In the middle of a ten-year timeframe," *i.e.*, in year five following accreditation, an institution must submit "what's called a periodic review report" ("Periodic Review Report" or "PRR"). ECF 44 at 64. According to Dr. Sibolski, "basically it's an update" on "changes that had taken place …, current financials and enrollment, and changes that were suggested by the evaluation committee at the first year point." *Id*. No on-site evaluation is conducted; rather, a team of three peer reviewers, which "consists of two primary reviewers and a financial reviewer," reads "documents supplied by the institution." *Id*. Debra Klinman, Ph.D., who serves as Vice President of the Commission, explained that the peer review teams for the periodic reviews are selected by the Commission's staff members. Motion Hearing, Testimony of Debra Klinman ("Klinman Testimony"), ECF 44 at 87. The staff aims to select peer reviewers who are "a good match in terms of expertise," meaning that they come from "institutions that serve similar populations of students." *Id*.

According to Dr. Sibolski, if, during the periodic review, "there is a sense that there needs to be some follow-up with an institution either because there is concern about whether it will remain in compliance or [because] the reviewers and the Commission have found that [the institution] is out of compliance with one or more standards," someone representing the Commission will ask for follow-up.  Sibolski Testimony, ECF 44 at 66.  If the periodic review team determines that an institution is "out of compliance" with one or more of the Commission's standards, the institution will be "placed on warning," and a peer review team will be sent to conduct an on-site evaluation.  *Id*.  If the institution is in compliance at the time of the periodic review, and no follow-up is required, no further action will be taken until the ten-year mark in the cycle, which essentially becomes the first-year mark in the next cycle.  *Id*. at 75.

In "year one," the institution again submits a self-study report to the Commission assessing its compliance with the Commission's standards; the institution is then visited by a team of peer reviewers, who evaluate the institution's compliance and make a recommendation regarding accreditation; the team's decision is then reviewed by a standing committee of the Commission and then the full Commission.  ECF 44 at 64, 65.

### D.  The Commission's Requirements and Standards

The Commission has ten Requirements for Affiliation ("Requirements") and fourteen Standards for Accreditation ("Standards").  *See* Standards Guide, Def.'s Ex. 47 at ix-xiii.  The Requirements are one or two sentences each and are presented as a simple list.  *Id*. at xii-xiii.  Of importance here, Requirement of Affiliation 5 states:  "The institution complies with all applicable government (usually federal and state) policies, regulations, and requirements."  *Id*. at xii.  Requirement 8 states:  "The institution has documented financial resources, funding base,

and plans for financial development adequate to support its educational purposes and programs to ensure financial stability." *Id*. at xii,.

The Standards are also expressed in one or two sentences each.  *E.g.*, Standards Guide, Def.'s Ex. 47 at ix-xi.  But, each standard is followed in the Standards Guide by a narrative text titled "Context," a list of factors titled "Fundamental Elements of Institutional Resources," and a list of factors titled "Optional Analysis and Evidence."  *E.g.*, *id.* at 1-3.

"Standard 3," titled "Institutional Resources," is of importance here.  It states, Standards Guide, Def.'s Ex. 47 at 9:

> The human, financial, technical, facilities, and other resources necessary to achieve an institution's mission and goals are available and accessible.  In the context of the institution's mission, the effective and efficient uses of the institution's resources are analyzed as part of ongoing outcomes assessment.

In the "Context" section applicable to Standard 3, the Standards Guide states, in relevant part, *id.*:

> The efficient and effective use of institutional resources requires sound financial planning linked to institutional goals and strategies.  … The institution should demonstrate through an analysis of financial data and its financial plan that it has sufficient financial resources and a financial plan to carry out its mission and execute its plans, and if necessary, a realistic plan to implement corrective action to strengthen the institution financially within an acceptable time period.

At the end of the "Fundamental Elements of Institutional Resources" section applicable to Standard 3, the Standards Guide states, in relevant part, *id.* at 11:

> Institutions and evaluators must consider the totality that is created by the fundamental elements and any other relevant institutional information or analysis. Fundamental elements and contextual statements should not be applied separately as checklists.  Where an institution does not possess or demonstrate evidence of a particular Fundamental Element, the institution may demonstrate through alternative information and analysis that it meets the standard.

In sum, the Commission's Requirements and its Standards demand, among other things, that an institution seeking accreditation or continued accreditation demonstrate that the institution has "available and accessible" the financial resources necessary "to achieve" its "mission and goals" (Standard 3) as well as programs to "ensure financial stability" (Requirement 5).   Notably, the text is written almost entirely in the present tense.   The interpretive text accompanying Standard 3 also makes clear that assessment of an institution's compliance with Standard 3 requires consideration of "the *totality* that is created by" the identified "fundamental elements and *any other* relevant institutional information or analysis." *Id.* at 11 (emphasis added).[8]

### E.  The College's Accreditation Status

Middle States first accredited the College in 1980.  Simmons Decl., ECF 1-2 ¶ 5; Sibolski Testimony, ECF 44 at 65.   It most recently reaffirmed the College's accreditation in 2006.  Sibolski Testimony, ECF 44 at 73.   However, the College's accreditation has been in question since 2011.

On June 1, 2011, the College submitted a Period Review Report ("PRR") in accordance with the five-year mark in the Commission's decennial review process, discussed *supra*.  Record of Appeal, Def.'s Ex. 45 at 1-112; *see also* Motion Hearing, Def.'s Ex. 17 (same).  The PRR

---

[8] The Commission also expressed concern with the College's compliance with Standard 7 and Standard 14.  However, the College was later found to have complied with those standards.

Standard 7 states:   "The institution has developed and implemented an assessment process that evaluates its overall effectiveness in achieving its mission and goals and its compliance with accreditation standards."   Standards Guide, Def.'s Ex. 47 at x.  Standard 14 states: "Assessment of student learning demonstrates that, at graduation, or other appropriate points, the institution's students have knowledge, skills, and competencies consistent with institutional and appropriate higher education goals."  *Id.* at xi.

outlined what the College described as "major institutional curricula change" implemented since the Commission's 2006 review, including new degree "programs in health related fields." Record of Appeal, Def.'s Ex. 45 at 7.  With respect to finances, the College reported that, "after experiencing deficit spending from 2006-2009," the College was "operating with a surplus of revenue over expenditures" at the time of the report.  *Id*. at 38.  The PRR pointed to select hiring and pay freezes, "increases in enrollment driven by the addition of high demand programs such as Nursing," *id*. at 35, new State and federal grants, and rising values of real estate owned by the College to explain its budget turnaround.  *Id*. at 35-38.  The PRR also included an executed "Certification Statement," in which the College certified that the College "meets" all of the Commission's Requirements of Affiliation.  *Id*. at 62.  The College did not submit audited financial statements along with its PRR, despite an apparent Commission policy requiring submission of such statements.  *See id.* at 118.

The College's PRR was reviewed by three peer reviewers selected by the Commission's staff.  *See* Sibolski Testimony, ECF 44 at 87-88.  The reviewers produced a "Report to Faculty, Administrators, Trustees, [and] Students of" the College, dated August 1, 2011 ("August 2011 Report").  *See* Record of Appeal, Def.'s Ex. 45 at 113-124; *see also* Motion Hearing, Def.'s Ex. 18 (same).  In the August 2011 Report, the reviewers generally commended the College for its response to recommendations from the 2005-2006 review cycle.  Record of Appeal, Def.'s Ex. 45 at 114-16.[9]  However, the reviewers also determined that "the evidence provided by the College suggests that the financial stability of Sojourner-Douglass College is fragile."  *Id*. at 117.

---

[9] The reviewers outlined progress on recommendations from 2006 pursuant to Commission Standards 7 and 11, in particular, but also stated that they "could find little evidence in the PRR or support documents that the College has in fact implemented a cycle of planning,

In an addendum, *id.* at 123-25, *see also* Motion Hearing, Def.'s Ex. 19 (same), created by the peer reviewer responsible for financial evaluation, *see* Sibolski Testimony, ECF 44 at 64, the August 2011 Report stated, in part, Record of Appeal, Def.'s Ex. 45 at 123:

> Based on the financial information provided … , the financial condition of this college is challenging at best. Amounts reported indicate significant operating losses compared to budgeted surpluses for 2008 and 2009, but a significant improvement, both in actual surplus and comparison to budget, in 2010. Projected amounts for the ensuing three years reflect significant surpluses, but a 15% reduction in projected government grants in those years would turn those projected surpluses into projected deficits.
>
> As noted by the institution in its PRR, [the College] is very reliant on tuition dollars and government grants and therefore unexpected negative changes in either enrollment or the availability of government grants could be very negative. In recent years and in projected budgets almost 60% of total revenue is tuition and slightly less is government grants. Considering the current financial issues being addressed in both federal and state governments, this is a significant financial concern that may not be accurately projected.

The financial reviewer's addendum also observed that in 2009 the College "was in default of its long term debt,"[10] and that the College reported "liabilities to the IRS for delinquent payments of withheld payroll tax,[11] a material weakness in internal control and a significant deficiency in controls due to the lack of a financial controller, which resulted in a lack of adequate controls and timeliness of financial reports." *Id.*

It appears that between August 1 and 11, 2011, the College provided the Commission with audited financial statements for the previous fiscal year; the financial reviewer's addendum itself contains an addendum dated August 11, 2011, which the reviewer created after receipt of

---

assessment and evaluations for its academic programs as recommended by the 2006 visiting team." Record of Appeal at 119.

[10] The August 2011 Report does not explain the "debt" to which it referred, or how the College defaulted on that debt.

[11] The August 2011 Report does not identify the amount of the tax liabilities.

the College's previously unavailable "2010 audited financial statements."   Record of Appeal, Def.'s Ex. 45 at 124.   The reviewer concluded that these statements "reported a significantly worse financial position than was included in the preliminary internal financial results."   *Id*.   The statements also revealed that the College failed "to return unearned Title VI funds as required," that it was not meeting the Department's "financial stability requirements," and that "[i]nterest rates on the institution's debt, in the current financial environment of low interest are 15% on their short-term loan and 8.75% on their long-term debt."   *Id*.

At some point in August 2011, the College also submitted a "substantive change proposal" to the Commission, seeking approval to create new on-line programs.   "Substantive change" is a technical term defined in part by 34 C.F.R. § 602.22 and in part by accrediting agencies.   Specifically, § 602.22 requires that an accrediting agency "must maintain adequate substantive change policies that ensure that any substantive change to the educational mission, program, or programs of an institution after the agency has accredited or preaccredited the institution does not adversely affect the capacity of the institution to continue to meet the agency's standards," and that the "agency's definition of substantive change includes at least the "addition of courses or programs that represent a significant departure from the existing offerings … or method of delivery … ."

The Commission's policy on substantive changes reflects that it considers a change as substantive if it involves the "initiation or expansion of distance education or correspondence education," including on-line education, "wherein 50% or more of the courses or credits in one or more academic programs are provided through alternative delivery … ." ECF 15-9 at 2 (copy of Commission's "Substantive Change" policy, current as of June 26, 2014, submitted to the

Panel).  Moreover, the Commission considers any change that requires "in-depth review" or "requires the Commission to engage a consultant with expertise in a particular area" to be a "Complex Substantive Change."  ECF 15-9 at 1.  Notably, a substantive change requires pre-approval by the Commission.  *See id.*

According to Dr. Simmons, in 2011 the College's Board of Directors "entered into an agreement with Latimer Education finalizing negotiations that began in 2010 with a company organized to enable minority serving community oriented institutions such as [the College] to more effectively serve [the College's] target populations through on-line programs."  Record of Appeal, Def.'s Ex. 45 at 3426 (transcript of hearing of Nov. 20, 2014, before the Commission). The College believed that "Latimer would have been able to bring in the investment capital needed to fund a development and implementation of on-line programs, as well as expertise and business aspects of higher education."  *Id.* at 3436-37.  However, MSCHE did not grant the requested approval at that time.  *See*, *e.g.*, Motion Hearing, Def.'s Ex. 21 (MSCHE letter to SDC).

The College submitted a written response to the August 2011 Report on August 30, 2011. Record of Appeal, Def.'s Ex. 45 at 125-138; *see also* Motion Hearing, Def.'s Ex. 20 (same). SDC "acknowledge[d] the difficulties the College has encountered with respect to its financial position."  Record of Appeal, Def.'s Ex. 45 at 131.  However, it disagreed with "the Finance [reviewer's] characterization of the results of the 2010 audited financial statements … ."  *Id.* at 132.  The College observed that it had "reduced the deficit from a high of $1.7 million in fiscal year 2007 to a $687,00 surplus in fiscal year 2010," *id.*; had already received a number of multi-year grants; and outlined "a series of unfortunate personnel matters" in its finance department

spanning the years 2005 to 2008 that it had rectified.  Record of Appeal, Def.'s Ex. 45 at 134.

The College also "acknowledge[d]" the debt to the IRS but stated:  "The College expects to

resolve this issue during fiscal year 2012."  *Id*. at 136.

The peer reviewers who drafted the August 2011 Report completed a confidential "Brief

to the Commission on Higher Education," dated September 2, 2011.  Record of Appeal, Def.'s

Ex. 45 at 139-142.  The reviewers summarized their findings in the August 2011 Report and

recommended that "the Commission reaffirm accreditation and request a monitoring report by

April 1, 2012 documenting progress on the following: stability of key personnel within the

financing department; strengthening of internal financial controls; financial issues arising from

long term debt obligations; budget projections assuming continuing availability of government

grant support; compliance with [USDE] stability requirements; and the KPMG financial ratios

that are currently below suggested minimum levels."  *Id*. at 141-42.

On November 18, 2011, the Commission sent a letter to the College informing it of the

Commission's decision to "accept the [PRR] and to warn the institution that its accreditation may

be in jeopardy because of insufficient evidence that the institution is currently in compliance

with Standard 3 (Institutional Resources) … .."  Motion Hearing, Def.'s Ex. 21 ("2011 Warning

Letter").[12]  The Commission also requested a monitoring report, due September 1, 2012, *id.*,

> documenting that the institution has achieved and can sustain compliance with
> Standards 3 … including but not limited to evidence of (1) additional steps taken
> to improve the institution's short- and long-term financial viability and the
> institution's sustainability, including adequate institutional controls to deal with

---

[12] The 2011 Warning Letter is another example of a commission document that is not contained in the Record of Appeal.  In the 2011 Warning Letter, the Commission also found insufficient evidence of compliance with Standard 7 (Institutional Assessment) and Standard 14 (Assessment of Student Learning), discussed earlier.  However, as noted, these Standards were later satisfied by SDC.  Therefore, I have not included detail as to them.

financial, administrative and auxiliary operations and the development of alternative funding sources (Standard 3) … .

The 2011 Warning Letter further informed the College that a "Commission liaison guidance visit to discuss the Commission's expectations" would follow, as well as another "small team visit" after submission of the requested monitoring report. 2011 Warning Letter, Def.'s Ex. 21. In the 2011 Warning Letter, the Commission also "acknowledge[d] receipt of the complex substantive change request to enter into a contractual agreement for the purpose of developing a new online division of the college," but stated that the Commission would "not consider this or any other substantive change request until accreditation has been reaffirmed." *Id*.

Dr. Klinman, "the Commission liaison" to the College, Klinman Testimony, ECF 44 at 84, visited the College on January 31, 2012. Motion Hearing, Def.'s Ex. 22 ("Klinman Memo"); Klinman Testimony, ECF 44 at 96. She met with dozens of persons in the College's administration and on its faculty, and prepared a brief memo to the Commission, summarizing her visit. Klinman Memo, Def.'s Ex. 22. In her memo, Dr. Klinman stated, in part, *id.*:

> In each meeting throughout the day, I provided an overview of the current accreditation issues that the College is facing relevant to Commission Standard 3, … . I presented both a "best case" and a "worst case" scenario, ranging from reaccreditation in November 2012 … , to the possibility of an adverse action by the Commission. I made it clear that the entire process will be framed by federal regulations, which stipulate a two-year timeline for the resolution of the College's warning status.

Dr. Klinman also observed that Dr. Simmons "was very interested in understanding the time line for resubmission of the SDC Complex Substantive Change proposal, to develop a for-profit online division of the institution." Klinman Memo, Def.'s Ex. 22. Dr. Klinman

"explained that the institution's warning status needs to be resolved before the Commission will consider the re-submission." *Id.*

On August 29, 2012, the College submitted the monitoring report that the Commission had requested in the 2011 Warning Letter ("First Monitoring Report"). *See* Record of Appeal, Def.'s Ex. 45 at 143-2334; *see also* Motion Hearing, Def.'s Ex. 23 (same). The College described, at length, and with numerous attachments, the progress it believed it had made toward achieving compliance with the Commission's standards. *Id.* A few weeks later, on September 19 and 20, 2012, another small team of three peer reviewers visited the College to evaluate its compliance ("September 2012 Report"). *See* Record of Appeal, Def.'s Ex. 45 at 2335-46; *see also* Motion Hearing, Def.'s Ex. 24 (same).

In the September 2012 Report, the peer reviewers concluded that the College was not in compliance with Standard 3, "due to a pattern of late financial audits and the fact that the institution has not met its tax obligations because of cash flow and other factors." Record of Appeal, Def.'s Ex. 45 at 2346.[13] More specifically, the team reported the following, *id.* at 2339:

> Through its review of the audited financial statements and interviews with [College administrators], the team found that the College has an outstanding obligation with the IRS regarding current as well as prior year Federal withholding tax, interest and penalty payments. Preliminary negotiations for a repayment schedule have been held but not concluded.
>
> The College has contracted with SB & Company to complete its audit for the fiscal year ended June 30, 2012. The audit fieldwork is scheduled to begin October 15, 2012 with a November 30, 2012 target completion date. The November 30th completion date will not, however, allow the College to comply with a loan covenant with American Bank that requires submission of annual audited financial statements within ninety days of the close of the fiscal year.

---

[13] The review team determined that the College was in compliance with Standards 7 and 14, Record of Appeal at 2346, which the Commission had indicated were in question in its 2011 Warning Letter. Def.'s Ex. 21.

The team also commended the College for making "several critical hires in the business office" and for drafting new policies and procedures for the office, and noted that the College had two consecutive years of operating surpluses.  Record of Appeal, Def.'s Ex. 45 at 2339.  The team issued two "requirements": 1) complete the College's "annual audit by September 30, 2013 to comply with its loan covenant"; and 2) "have an external tax audit conducted to determine the total outstanding liability to the IRS … ."  *Id*. at 2340.  The team added:  "The external audit should be used by [the College] to develop a repayment plan for the outstanding obligation and to detail strategies that the College will implement to remain current with its Federal withholding tax obligations."  *Id*. The team also recommended that the College refinance its "term loan with American Bank … with the goal of having the loan refinanced before the October 1, 2013 balloon payment deadline."  *Id*.  I shall refer to this "term loan with American Bank" as the "American Bank Debt."

The College submitted an "Institutional Response" to the September 2012 Report. Record of Appeal, Def.'s Ex. 45 at 2347-2356; *see also* Motion Hearing, Def.'s Ex. 25 (same). Notably, the College accepted the team's "requirements" and recommendation with respect to Standard 3, as just discussed.  *E.g.*, Record of Appeal, Def.'s Ex. 45 at 2350 ("The College accepts the team's requirement to complete its annual audit by September 30, 2013."); *id.* ("The College accepts the team's requirement to have an external tax audit.").  It explained that it had advanced the timeline for completion of its FY 2012 audit; obtained a waiver of the applicable loan covenant for 2012; hired a firm "to negotiate a payment plan acceptable to the IRS and College as well as monitor the timely deposit of withholding taxes," *id.* at 2350; and opened discussions with American Bank and other banks regarding refinancing of its loan with

American Bank.   Record of Appeal, Def.'s Ex. 45 at 2351.   In addition, the College outlined

planned efforts to enable it to "remain current" on tax obligations, including the launch of a $2

million capital campaign, an increase in fees and tuition, a hiring freeze, and a targeted increase

in enrollment of 2% each year.  *Id.*  at 2350-51.

On November 19, 2012, the Commission sent a letter to the College informing it of

actions taken by the Commission with respect to the College's monitoring report ("2012

Warning Letter").   *See* Motion Hearing, Def.'s Ex. 26.   The Commission again warned the

College that "its accreditation may be in jeopardy because of insufficient evidence that it is in

compliance with Standard 3."[14]   *Id.*   It requested another monitoring report, due in just over one

year, as follows, *id.*:

> [The Commission acted to:] request a monitoring report, due November 1, 2013,
> documenting evidence that the institution has achieved and can sustain
> compliance with Standard 3 (Institutional Resources).   To request that the
> monitoring report include, but not be limited to (1) a completed FY 13 audit; (2) a
> completed external audit to determine the total of all outstanding financial
> liabilities, including penalties and interest payments; and (3) the development and
> implementation of a payment plan to address all outstanding financial obligations
> and to remain current in meeting subsequent obligations (Standard 3). …

The Commission informed the College that another small team visit would follow

submission of the monitoring report.   Notably, the Commission also decided to "extend the

period for demonstrating compliance by one year," for good cause, because the College

"demonstrated significant progress towards the resolution of its non-compliance issues," was

"making a good faith effort to remedy existing deficiencies," and the Commission had a

"reasonable expectation … that such deficiencies" would be "remedied within the period of

---

[14] The Commission also affirmed the small team's determination that the College was in
compliance with Standards 7 and 14.

extension." *Id*.   The one-year extension extended the College's time frame to come into compliance from two years, *i.e.*, November 2013, to the maximum of three years, *i.e.* November 2014.  *See* 34 C.F.R. §§ 602.3, 602.20; 2011 Warning Letter, Def.'s Ex. 21; Klinman Memo, Def.'s Ex. 22.

The 2012 Warning Letter also reiterated that the Commission would not consider the College's "substantive change request" related to development of a new online division of the College "until accreditation has been reaffirmed."  Def.'s Ex. 26.

On November 1, 2013, the College submitted the monitoring report that the Commission requested in its 2012 Warning Letter ("Second Monitoring Report").  *See* Record of Appeal, Def.'s Ex. 45 at 2367-2790; *see also* Motion Hearing, Def.'s Ex. 28 (same).  In the introduction to the Second Monitoring Report, the College described the report's "main thrust" as follows: "to provide a credible account that the College has the human, financial, technical, facilities and other resources necessary to achieve [the] institution's mission and goals, [and] the resources are available and accessible … ."  Record of Appeal, Def.'s Ex. 45 at 2370.  It acknowledged that in November 2012, the Commission "continued the warning that the institution's accreditation may be in jeopardy because of insufficient evidence that it is in compliance with Standard 3 (Institutional Resources)."  *Id*. at 2371.

The College responded, point by point, to the specific information requested in the 2012 Warning Letter.  *Id*. at 2373-2381.  It also explained its understanding of the Commission's reasons for the continued warning, as follows:

> This warning came as a result of the following concerns noted during the site
> visit and evidence submitted:

- that the College would not be able to repay all liabilities including the IRS debt while demonstrating an ability to remain current with all payments;
- that the College would not be able to obtain a refinance agreement once the current finance balloon payment ended in October 2013;
- that the College would not be able to complete an unqualified 'clean audit' prior to the monitoring report due date of November 1, 2013.

The Second Monitoring Report showed little progress with respect to the concerns that the College itself stated it believed had led to the Commission's continued warning.  *See* Record of Appeal, Def.'s Ex. 45 at 2371.  With respect to its tax obligations, the College represented that it had "completed" all "tax filings" with the IRS, and that it had been working to negotiate a repayment plan since May 2013, but that it had not yet been able "to establish a payment plan." *Id*. at 2375.  SDC stated that its "goal" was to "establish an 'offer and compromise' settlement plan with the IRS that will reduce the amount of the penalty and interest that has accrued," *id.*, and that its agent would begin negotiations again "expeditiously."  *Id.* at 2381.  With regard to the debt set to mature in October 2013— *i.e.*, the American Bank Debt— the College explained that it had not refinanced the debt.  Rather, it was "working under a month to month extension," and, "[i]n the next 90 days," it "expect[ed] to consolidate" the debt "and other outstanding obligations into one loan at a significantly lower interest rate with another" unidentified bank. Def.'s Ex. 45, Record of Appeal at 2381.

The College submitted a FY 2013 audit, completed externally by SB & Company, LLC. ("2013 Audit").  *See* Record of Appeal, Def.'s Ex. 45 at 2460-79; *see also* Motion Hearing, Def.'s Ex. 30 (same).  Notably, the 2013 Audit stated:  "The College had certain negative factors during the year ended June 30, 2013, which raises substantial doubt about the College's ability to continue as a going concern."  Record of Appeal, Def.'s Ex. 45 at 2465.  Specifically, the 2013

Audit "'indicated the College has 'suffered reductions in grant and tuition revenue; reoccurring negative results from operations; has a deficit of expenses over revenue of $5,235,783, for the year ended June 30, 2013; has a cumulative net deficit of $2,758,245, as of June 30, 2013, and has a bank overdraft of $412,855, as of June 30, 2013.'"  Second Monitoring Report, Record of Appeal, Def.'s Ex. 45 at 2373 (quoting 2013 Audit at 2461).  In addition, the 2013 Audit showed that the College had "a 'debt of $7,754,710 that matured on October 1, 2013 [(presumably the American Bank Debt)] and has a $5,814,337, liability to the Federal and state government due to the College's failure to pay payroll taxes due.'"  Second Monitoring Report, Record of Appeal, Def.'s Ex. 45 at 2373 (quoting 2013 Audit at 2461).

The Second Monitoring Report also articulated, in brief, the College's response to each of the concerns identified in the FY 2013 audit.  One of these responses related the College's plan to pay down its outstanding debt through a sale/leaseback plan (the "Sale/Leaseback Plan"), as follows, *id.* at 2375:

> **Auditor's Going Concern Issue #4**—The College needs to improve working capital.
>
> **College's Response to Going Concern Issue #4**—The College currently owns property and buildings with an assessed value of $24,570,000.  The College is in current negotiations to execute a sale leaseback deal for one building for $13,000,000.  Appraisals and a copy of the contract are provided (Attachment D).  When the deal is consummated proceeds from the sale will be used to pay down current liabilities and provide operating cash that will increase the current assets.  This action will improve working capital.  It will also increase our current ratio percentages and release cash reserves that are being held in escrow.  This will also improve our financial position and decrease our need for short term borrowing while reducing the College's interest expense costs.

In conjunction with the Sale/Leaseback Plan, the College attached to its Second Monitoring Report a contract for sale for one of the College's properties, located at 200 N.

Central Avenue, in Baltimore, Maryland, for a sale price of $13 million, executed by the College and the purchaser on October 4, 2013.  Record of Appeal, Def.'s Ex. 45 at 2409-2420.  The contract specified a closing date on or before November 15, 2013, "provided that all conditions" specified in the contract were satisfied.  *Id.* at 2414.

Notably, in its Second Monitoring Report, the College also referenced "federal changes in the Pell Grant program"[15] that "had a negative effect on many colleges but particularly on Sojourner-Douglass College."  *Id.* at 2376.  It explained that "the Lifetime Eligibility Used statute … restricts the amount of Pell grants awarded to students during their lifetime."  *Id*. According to SDC, changes in this program resulted in a 7% decrease in federal grants awarded to the College in FY 2012 because "the average age of Sojourner's student body is 36 and those affected were transfer students."  *Id*. at 2376.

A team of two peer reviewers visited the College on December 16 through 18, 2013 ("December 2013 Report").  *See* Record of Appeal, Def.'s Ex. 45 at 2791-2802; *see also* Motion Hearing, Def.'s Ex. 29 (same).  The small team was chaired by George Pruitt, Ph.D., President of Thomas Edison State College in New Jersey, who is also the Chair of the Commission.  Motion Hearing, Testimony of George Pruitt ("Pruitt Testimony"), ECF 47 at 4.  He stated that the average student at his institution is 39 years of age, and he believes his institution serves a "similar demographic[ ]" to that of the College.  *Id*. at 5.

---

[15] At the Motion Hearing, Dr. Klinman explained Pell grants and the relevant changes as follows:  "Pell grants are available to students who have documented financial need, and as of July first, 2012, the federal government put a lifetime eligibility cap on those awards, and it also remitted the number of sessions per year that a student could draw down Pell funds."  ECF 44 at 166-67.

Dr. Pruitt has been a college president for 33 years, a dean at Towson University in Maryland, and a vice-president at two other institutions, including Morgan State University in Baltimore.  ECF 47 at 9, 22.  He also testified that he has been "deeply embedded in the federal oversight of accreditation for over 25 years," and for 19 years, by appointment of several presidential administrations, he served on a national committee responsible for evaluating the accrediting agencies themselves, to assure that "they are compliant with the standards set forth by the Secretary and federal regulation and the statute."  *Id.* at 4-5.

The team also included Henry Mauermeyer, Senior Vice President for Administration and Chief Fiscal Officer of the New Jersey Institute of Technology.  December 2013 Report, Def.'s Ex. 45 at 2791; Pruitt Testimony, ECF 47 at 7.  At the Motion Hearing, Dr. Pruitt referred to Mauermeyer as a "fiscal expert."  *Id.* at 9.

Dr. Pruitt described his expectations and findings on the visit to SDC in December 2013 in part, as follows:  "The two-year customary period had exhausted itself . . . I was hoping to find substantial progress had been made, because, by December of 2013, [SDC] had about eleven months before [it] hit a cliff, because, at the end of that period, we would have no option but either to determine that they were in compliance or withdraw their accreditation."  ECF 47 at 8, 9.  Further, Dr. Pruitt stated, *id.* at 12:  "The purpose of the visit was to ascertain whether the institution was in compliance, not whether it had good plans."  He elaborated, *id.* at 12-13:  "[E]very time we went there, we saw about plans about coming into compliance, but the standard is not to have a plan to be in compliance; the standard is to be in compliance, and, in December of 2013, they were a long way, by any reasonable measure, of being in compliance . . . ."

In addition, Dr. Pruitt recalled:  "I was hoping to find an institution that was well underway [sic] of satisfying the requirements of Standard 3.  Instead, I found an institution that had four fire alarms blaring."  ECF 47 at 9; *see also id.* at 11 (stating that four fires were "raging" at SDC).  He identified the "four fire alarms" as follows:  1) the College's "inability to service its debt with its creditors"; 2) the "going concern letter issued by its own auditor"; 3) "significant tax liabilities"; and 4) that the College "was in continuous deficit and had not been able to come into balance with its revenues and its expenditures since 2011."  *Id.* at 10.  Further, he testified that the Commission was not only concerned about the fires.  *Id.* at 11.

In Dr. Pruitt's view, the College "was in continuing decline."  *Id.* at 10.  He explained, *id.* at 11:

> [W]e were concerned about putting the fires out, but just putting the fires out in and of itself would not have been sufficient to indicate that the institution satisfied the requirements of financial sufficiency to carry out its mission.  But, if you hadn't put the fire out, you can't get to the other indices until those four are solved, and so the Commission spent a lot of time focusing on those four specific issues.

According to Dr. Pruitt, even if all four issues were addressed by the College, it "still would have had to demonstrate that, after surviving that; that they had the sufficient resources going forward to be able to prosecute their mission and offer reasonable, quality educational services. . . ."  *Id.*  Dr. Pruitt related these matters to Dr. Simmons and to the College's Board of Directors during the site visit.  *Id.* at 12.  He tried to convey a "sense of urgency" because "there were clear time lines here that were controlled by federal requirement that would not allow us legally to grant any further time."  *Id.*[16]

---

[16] As discussed, *supra*, at the time of Dr. Pruitt's testimony, SDC was still pressing its race-based discrimination claims with respect to Count I.  Accordingly, on that point, Dr. Pruitt

In the small team's report to the College about the visit, the team concluded that the College had not "provided sufficient evidence" of its compliance with Standard 3. December 2013 Report, Record of Appeal, Def.'s Ex. 45 at 2794. The team reviewed the same four issues that "the Commission noted in [its] request for a monitoring report," *id.* at 2794-95, and which the College addressed in its Second Monitoring Report. It observed that the College had completed and submitted a FY 2013 audit, but that the audit contained "a 'going concern' opinion." *Id.* at 2794. Further, it related that the College reported it is "now paying their taxes, but that payments may not always be on time," and the College "indicated that there would be a meeting with the IRS in mid-January 2014." *Id.* The College "did provide a financial plan, including assumptions, to address its deficit position," but the reviewers found that the College was already off track to meet its FY 2014 revenue target, and that the plan included what appeared to be some "overly optimistic" estimates for reducing expenses for bad debt. *Id.* With respect to the intended refinancing of the College's American Bank Debt, the report stated that the "term loan had not been refinanced." *Id.* at 2795. Referring to the Sale/Leaseback Plan, the report explained that the College "intended to retire the debt" by selling "certain properties," and

---

disputed SDC's contention that MSCHE's decisions were the product of racial discrimination. He said, *inter alia*, the following, ECF 47 at 23-24:

> This country has a lot of problems with race that still have to be addressed. This city has a lot of problems with race that has [sic] to be addressed, but this is not one of them. There is no way that I would chair a Commission that in any way disadvantaged an individual, a student, and certainly an institution because of its race. Neither would Dr. Jones that did the fiscal work on the subsequent team visit. Neither would my African-American colleagues that sit on this Commission have in any way tolerated such a— such action.

> We are not here because of race, culture, or mission. We are here because of finances. . . . I am very disappointed that one of the bases of this hearing and proceedings is the allegation that race was a factor. It absolutely and unequivocally was not. This is not about race. This is about finances and money.

that a sale agreement had been executed, but stated that: "there is no closing date at this time."

Record of Appeal, Def.'s Ex. 45 at 2795.

The team's report also related a handful of other financial concerns.  It concluded, *id.*:

> In conclusion, [the College] is still working through several outstanding financial issues that raise serious concern for the team:  The property sale has not been completed, the debt has not been refinanced, the federal tax issue has not been settled, there is a projected loss in tuition and fee income, the College has very limited working capital, and the auditors have expressed a 'going concern' opinion.  Therefore the team concludes that there is not sufficient evidence that [the College] has the financial resources to continue to support and sustain its mission.

The team set out one "recommendation" and six non-exclusive "requirements" with respect to Standard 3.

The team recommended that the College "review its fiscal planning process" and develop a "cash flow model" so that the College "could identify issues before they occur and … permit more timely resolution so that [the College] would not need to rely on its prior practice of non-payment of federal and state taxes."  December 2013 Report, Record of Appeal, Def.'s Ex. 45 at 2795.  It set out the following six "requirements" (hereinafter, "Six Points"), *id.* at 2792-93 (emphasis added):

> Sojourner-Douglass College must demonstrate that it has developed and implemented a financial planning and budgeting process, aligned with the institution's mission and goals, that provides for multi-year budgets and realistic enrollment projections and demonstrates that the institution has sufficient resources to carry out its mission and execute its plans.  *More specifically, the institution must provide documentation that includes, but is not limited to* (1) the completion of the planned sale/lease-back of property and an analysis of its impact on institutional debt and operating expenses; (2) the implementation of a satisfactory plan for the repayment of unpaid federal and state taxes, interest and penalties;  (3) the completion of efforts to consolidate and refinance the institution's term loan; (4) the implementation of additional efforts to remediate the institution's deficit position, including budget projections and analysis of

underlying assumptions for FY 2015, FY 2016, and FY 2017; and (5) the completion of an audit that removes the 'going concern' opinion (Standard 3).[17]

The Six Points were clearly intended to address and satisfy the overarching objective also set out in the small team's report:   demonstration by SDC that it "has sufficient resources to carry out its mission and execute its plans."  Record of Appeal, Def.'s Ex. 45 at 2795.  The need to show sufficient resources was not prospective.  The small team emphasized—twice in its six-page report—that the College's time frame for compliance was limited by federal regulations and the Commission's one-time, one-year extension for good cause.  *Id.* at 2792, 2797.

The small team also outlined the next steps in the process.  It explained that the College would "have the opportunity to prepare and submit a formal Institutional Response to the team's findings," which would then be considered in January 2014, by the "Committee on Follow Up," along with "all relevant materials (the monitoring report and its attachments, the team report and the Chair's confidential brief, and the institutional response)," and considered again by "the full Commission … in early March 2014."  *Id.* at 2797.

On January 3, 2014, the College provided a two-page "formal institutional response" to the December 2013 Report ("2014 Response").  *See* Record of Appeal, Def.'s Ex. 45 at 2798-99; *see also* Motion Hearing, Def.'s Ex. 31 (same).  In its 2014 Response, the College praised the small team for the way the team "conducted themselves professionally and always with a concern for the mission of the College and its uniqueness," as well as "the work of the Team and the balanced report that the Team provided."  Record of Appeal, Def.'s Ex. 45 at 2798.  Further, the College stated:  *"The College agrees with the Team Report and accepts the challenges to*

---

[17]  As is apparent, the paragraph contains only five numbered points; one point is unnumbered, for a total of six points.

*make improvements where they are indicated*."   Record of Appeal, Def.'s Ex. 45 at 2798 (emphasis added).  It committed to "provide documentation that includes" each of the Six Points set forth in the December 2013 Report, as well as the recommendation to develop a cash flow model.  *Id*. at 2799.

As Chair of the small team, Dr. Pruitt prepared a confidential "Chair's Brief" for the Commission. *See* Record of Appeal, Def.'s Ex. 45 at 2800-2806; *see also* Pruitt Testimony, ECF 47 at 20-22.  The Chairs' Brief reviewed the findings just discussed, and recommended that the Commission "require the [College] to show cause, by September 1, 2014, as to why its accreditation should not be removed."  Record of Appeal, Def.'s Ex. 45 at 2801.  Dr. Pruitt also recommended that the College submit another follow-up report, *id.*, and that another "on-site visit" follow submission of the report, "to verify the information provided … and the institution's ongoing and sustainable compliance with the Commission's accreditation standards."  *Id*. at 2802.  In addition, Dr. Pruitt suggested that the "substantive report document evidence that the institution has achieved and can sustain ongoing compliance …including, but not limited to documented evidence" of the requirements the small team included in its December 2013 Report to the College.  *Id*.  Finally, he requested that SDC complete a "teach-out plan describing how, if the Commission terminates accreditation, any students requiring access to Title VI funding will be accommodated."  *Id*.

On March 6, 2014, the Commission acted to adopt all of the small team's recommendations, essentially verbatim, as stated by Dr. Pruitt in the Chair's Brief to the Commission.  *Compare* Motion Hearing, Def.'s Ex. 15 ("Show Cause Letter") (letter dated Mar. 7, 2014, describing MSCHE action of Mar. 6, 2014) *with* Chair's Brief, Record of Appeal, Def.'s

Ex. 45 at 2800 *and* December 2013 Report, Record of Appeal, Def.'s Ex. 45 at 2792-93.  The

Commission informed the College of its actions by letter dated March 7, 2014.  Show Cause

Letter, Def.'s Ex. 15.  In the Show Cause Letter, the Commission restated the requirements set

forth by Dr. Pruitt (*see* December 2013 Report, Record of Appeal at 2795-96, *supra*) as six

points (the "Six Points," *supra*, at 34) for which the College needed to submit "documented

evidence" with its anticipated report.  Show Cause Letter, Def.'s Ex. 15.  Additionally, the

Commission directed completion of "a prompt liaison guidance visit to discuss Commission

expectations … ." *Id.*

Dr. Klinman, the Commission's liaison to the College, visited the College again on

March 21, 2014.  *See* Motion Hearing, Def.'s Ex. 32 (Klinman Letter dated April 3, 2014

discussing visit).  She testified that the Commission's decision to "make yet another [liaison]

visit" to the College was "unusual."  Klinman Testimony, ECF 44 at 127.  Dr. Klinman added:

"Typically, that happens only once after a warning is issued." *Id.*

After Dr. Klinman visited SDC, she wrote a letter to Dr. Simmons dated April 3, 2014,

summarizing her visit.  Motion Hearing, Def.'s Ex. 32.  Dr. Klinman reiterated "the serious

nature of the show cause action … ." *Id.*  She also stated that the monitoring report due on

September 1, 2014, "must provide evidence in response to each of the topics raised by the

Commission" and "may also document the results of other initiatives undertaken to strengthen its

short- and long-term financial viability and sustainability." *Id.*  And, she outlined the next steps

in the process, including the Commission's appeals procedure and policy, as well as the time

frame for compliance.  Dr. Klinman said, *id.*:

> As you know, USDE regulations outlining the federal criteria for recognizing
> accrediting agencies specify a federally-mandated time frame for  the resolution

of accreditation problems (see 34 CFR 602.20).   In keeping with those criteria, when the full Commission meets on November 20, 2014, it will render a final decision.

On September 1, 2014, the College timely submitted its report, titled "Sojourner-Douglass College Middle States Substantive Report 2014" ("Substantive Report").  *See* Record of Appeal, Def.'s Ex. 45 at 2807-3170; *see also* Motion Hearing, Def.'s Ex. 33 (same).   The Substantive Report included a number of attachments responsive to the Six Points identified in the Show Cause Letter and the December 2013 Report.   Notably, the College attached copies of contracts of sale for *two* properties owned by the College, Record of Appeal, Def.'s Ex. 45 at 2872-2956, relevant to its Sale/Leaseback Plan to pay down its debt; a series of letters from the IRS, *id.* at 2957-2961; a Note Allonge showing the refinancing of the College's American Bank Debt, *id.* 2962-2974; and a FY 2014 audit, *id.* at 3149-3179, with no "going concern" opinion.   It also submitted tables showing that degree programs offered by the College match many of the most popular degree programs for online enrollment, various agreements for cross-enrollment executed with institutions of higher education in foreign countries, and letters of support from community and business leaders.  *Id.* at 2975-3119.

The College included as an attachment to the Substantive Report a letter from an IRS "Revenue Officer," dated August 25, 2014.   It stated, Record of Appeal, Def.'s Ex. 45 at 2960:

> This letter is a follow up to our conversation last week.  We discussed the need for the College to be in full compliance before any type of Installment Agreement or Offer in Compromise can be entered into.  The College has taken measures to reduce payroll expenses and the expectation is that they will be in full compliance by September 1, 2014.
>
> The College's plan to resolve their tax delinquencies is to pay over available net proceeds from the sale lease back and then enter into an Installment Agreement or an Offer in Compromise to resolve the remaining balance due.  This is an acceptable collection alternative; however, at this time, there is no formal

agreement in place.   Once the College is in full compliance with Federal tax deposits, we can move forward with a resolution.

On September 9, 2014, Bronte Jones, Ph.D., the Vice President for Finance and Administration at Dickinson College and a member of the small team that was to visit the College to follow up on the Substantive Report, sent an email to Dr. Simmons requesting additional information.   Motion Hearing, Pl.'s Ex. 4 ("Jones Email").   Dr. Jones reminded Dr. Simmons that the "purpose of the evaluation team is to verify the information provided in the substantive report and the institution's on-going and sustainable compliance with the Commission's accreditation standards."   *Id.*   Toward that end, she asked the College to deliver additional documents "to the hotel for our team review on Sunday, September 21, 2014."   *Id.*

Among other things, Dr. Jones requested a "report detailing the total outstanding balance on unpaid federal and state taxes, interest and penalties with appropriate supporting documentation"; a "schedule detailing tax payments made in FY14"; additional information about the purchasers named in the contracts for sale of real property included as attachments to the Substantive Report; "[b]udget to actual data for the past two fiscal years with a specific emphasis on budget to actual enrollment totals and the resulting net tuition revenue"; information on "the selection process used to select [the College's] new audit firm"; and a "cash flow model for the current fiscal year."   *Id.*   She added:   "*It is important that the team understand how you plan to address your financial obligations before and after the execution of the sale/lease back agreement.*"   *Id.* (emphasis added).   She also restated the Six Points included in the December 2013 Report and the Show Cause Letter; she emphasized, by underlining and printing in bold font, the following words in each of the Six Points, respectively: "implementation," "completion," "implementation," "completion," "implementation," "completion."   *Id.*

As requested, the College delivered a packet of responsive documents to Dr. Jones on September 21, 2014. Motion Hearing, Testimony of Dr. Charles Simmons, ECF 37 at 44-45; *see also* Pl.'s Ex. 5 (SDC documents delivered to Dr. Jones). Notably, a letter from the College's accountant to Dr. Simmons, dated September 19, 2014, showed that the balance of unpaid federal taxes, interest, and penalties stood at $5,639,298.28 through July 2014. Pl.'s Ex. 5. The documents also included a list of "Federal Tax Payments Made July 1, 2013 thru June 30, 2014," which showed, *inter alia*, that the College had not paid any monies toward tax amounts due in June 2014. *Id*.

On September 22 and 23, 2014, a small team of peer reviewers, composed of Dr. Jones and an Executive Vice President for Administration at Bryant & Stratton College, visited the College to follow up on the College's Substantive Report. They prepared a report of their visit ("September 2014 Report"). *See* Record of Appeal, Def.'s Ex. 45 at 3172-3179; *see also* Motion Hearing, Def.'s Ex. 34 (same). "[A]fter reviewing the Substantive Report and conducting on campus interviews," Record of Appeal, Def.'s Ex. 45 at 3179, the team concluded that the College "does not meet Standard 3." *Id*. at 3175. The small team observed that, "[i]n addition, the institution appears to be out of compliance with requirements for affiliation #5 and #8." *Id*.

The September 2014 Report also reviewed and assessed the documentation submitted by the College relevant to each of the Six Points included in the Show Cause Letter of March 7, 2014. With respect to SDC's budget, it pointed out a number of reasons why it felt that the College's projections were unrealistic. *Id*. It noted that the College's enrollment declined in 2014. *Id*. The College attributed the decline to "the change in regulations regarding the Pell grant program," discussed *supra*, "and the apparent negative publicity regarding [the

Commission's] show cause" action.  September 2014 Report, Record of Appeal, Def.'s Ex. 45 at 3175.  The College's projections for 2015, 2016, and 2017 "assume[d] enrollment increases to previous levels … due to the removal of the … show cause, a Substantive Change approval to offer online programs, and a Substantive Change approval for contractual agreements for international programs."  *Id*.  However, the team was "concerned that the … enrollment and related financial projections might be unrealistic since the institution has minimal experience with online and international programs and the change in the Pell grant program that originally negatively impacted enrollments has not been reversed."  *Id*.  It concluded:  "Therefore, while the Substantive Report showed … surpluses in 2014/2015, 2015/2016, and 2016/2017, there is minimal documented history to support that the surpluses will materialize."  *Id.* at 3175-76.

As to the Sale/Leaseback Plan, the September 2014 Report noted that the College had submitted executed sales agreements for two properties, but observed that the transactions were not completed and, based on the contingencies and closing dates specified in the contracts, the deals were more or less impossible to close as written.  *Id.* at 3176.  It pointed out, for example, that the team was "concerned about the institution's ability to comply with the requirements set forth in paragraphs 7.a.(iv) and (v)" of the sales contract for the property at 200 N. Central Avenue.  *Id.*  Those provisions specify that the sales contract was contingent upon the College "deliver[ing] evidence, in a form reasonably satisfactory to Purchaser, that all liens, including certain IRS Liens referenced in Circuit Court of Maryland for Baltimore City, Case Numbers: [excerpted], have been discharged," and upon satisfactory evidence, at closing, that the "Seller [*i.e.*, the College] is in good standing with, and duly accredited by, [the Commission], and not

subject to any investigation which may result in the loss of said accreditation." September 2014 Report, Record of Appeal, Def.'s Ex. 45 at 2879.

With respect to the College's outstanding tax liabilities, the September 2014 Report related that the College "had not executed an agreement with either federal or state [tax] authorities," and that the College had "accrued additional unpaid federal and state payroll tax liabilities in 2014." *Id*. at 3177. The College's cash flow analysis revealed that it expected the IRS to enter into an offer and compromise that would bring its liability down to $2 million (from liabilities "in excess of $7M"). *Id*.

As to SDC's refinancing of the American Bank Debt, the team noted that the College had completed a refinancing agreement, but the new "outstanding balance, plus interest accrued, and all fees and costs" were due and payable on September 1, 2016. Record of Appeal, Def.'s Ex. 45 at 3178; *see also* Motion Hearing, Def.'s Ex. 6 (copy of "Second Modification Agreement" for American Bank Debt). And, during "on campus interviews, management informed [the team] of a $1.3M penalty payment" that would be due and payable on the same date. *Id*.[18]

---

[18] At the Motion Hearing, SDC called James E. Plack, President and CEO of American Bank in Bethesda, Maryland, as a rebuttal witness. *See* Motion Hearing, ECF 47 at 106-118. Mr. Plack testified that $1,604,003.54 was added to the total due on the American Bank Debt when SDC refinanced the loan. *Id*. at 123. The additional sum represented "default interest" due on the loan, *id.*, dating back to a default that occurred in 2008. *Id*. at 124.

As discussed, *infra*, Middle States introduced a number of exhibits at the Motion Hearing to which SDC objected. Most of those exhibits related to additional debts secured by the real property that also constituted the security for the American Bank Debt. According to Mr. Plack, SDC technically defaulted on the American Bank Debt because SDC added the liens without American Bank's "knowledge or consent". *E.g.*, ECF 47 at 120-21; *see also* Motion Hearing, Def.'s Ex. 6 (copy of SDC's "Second Modification Agreement" with American Bank) at 1 ("Debtors have defaulted on the Loan by encumbering the Property with certain subordinate liens in violation of the terms of the Deed of Trust … ."); Record of Appeal, Def.'s Ex. 45 at 2963 (same).

Further, the team believed that even if the Sale/Leaseback Plan were consummated, SDC would still lack sufficient resources to bring it into compliance.  September 2014 Report, Record of Appeal, Def.'s Ex. 45 at 3178.  It stated, *id.*:

> The sale/leaseback transactions are the primary strategy for the institution to eliminate its substantial governmental and lender obligations.  If both sale/leaseback transactions are consummated, the proceeds would be sufficient to eliminate all lender debt and related penalties.  However, absent any formal agreements (to abate penalties and interest) with the federal and state tax authorities, there will be insufficient funds to eliminate all of the outstanding tax liabilities.  More importantly, there will be no proceeds remaining to fund current operations.  As noted above, generating surpluses in the near future are uncertain. Hence, even if the sales/leaseback transactions close, there do not appear to be adequate resources to support the short- and long-term financial stability of the institution.

The College submitted a written response to the September 2014 Report on October 23, 2014 ("October 2014 Response").  *See* Record of Appeal, Def.'s Ex. 45 at 3180-3375.  In the October 2014 Response, SDC disagreed with "certain observations and conclusions" in the team report and asserted:  "[T]he College has conclusively satisfied most of the six directives from MSCHE and for the remaining, we have instituted a comprehensive set of actions to ensure rapid completion as soon as the Commission reaffirms accreditation."  *Id*. at 3180.  The College included a number of new attachments, including a new letter from the IRS, addressed to Dr. Simmons, dated October 23, 2014.  *Id*. at 3201.  That letter stated, in relevant part, *id.*:  "The College's plan is to immediately be in full compliance with Federal tax deposits.  This letter

---

Middle States maintained that SDC had never revealed to the Commission the full extent of its debt, owing to the subordinated liens.  SDC argued that it produced what was required, and that, in any event, the Commission's evidence on this point was outside the Court's scope of review.  In my view, I need not consider the disputed documents because they would not change the outcome of my decisions on the pending motions.

confirms that you, on behalf of the College, have an acceptable collection plan to resolve your delinquent tax obligations." The letter did not provide any particulars to the plan, however.

Dr. Jones prepared a confidential "Chair's Brief" for the Commission with the small team's recommendation that the Commission "withdraw accreditation from Sojourner-Douglass College effective June 30, 2015." *Id.* at 3376-3381, 3376. Dr. Jones noted that the decision was "based on" each of the reports and responses described above. She concluded: "These and prior institutional reports and responses have failed to document that the institution has achieved and can sustain ongoing compliance with the Commission's Requirements of Affiliation #5, Requirement of Affiliation #8, and with Commission Standard 3 … ." *Id.* at 3376.

At some point between the completion of the September 2014 Report and November 20, 2014, the "follow up committee" of the Commission recommended that the Commission "remove accreditation" for SDC. Motion Hearing, Testimony of Gary Wirt, Ph.D. (Vice-Chair of Middle States and President of Goldey-Beacom College), ECF 47 at 63.

On November 11, 2014, the Commission sent a letter to Dr. Simmons informing him that the College could appear before the full Commission at its meeting on November 20, 2014, to present its case for accreditation in person, and that the College could submit "any additional information" by noon on Friday, November 14, 2014. Record of Appeal, Def.'s Ex. 45 at 3382-86. The College submitted additional information to the Commission by letters dated November 11, 2014, *id.* at 3387-3400, and November 14, 2014. *Id.* at 3401-05. In its letter of November 14, 2014, the College reported that it had established a repayment plan with the Comptroller of Maryland, *id.* at 3401, as evidenced by a letter from the Comptroller. *See id.* at 3406. It added that "[n]egotiations" with the IRS were "ongoing" and the College "remain[e]d optimistic that

similar arrangements—and documentation confirming the accepted plan—will follow in the near future." Record of Appeal, Def.'s Ex. 45 at 3401.

On November 19, 2014, *see* ECF 1-14 at 4, the College submitted an additional letter to the Commission from the IRS. It stated, in part, *id.* at 3408 (emphasis added):

> This letter is to confirm that [the College] has established a plan to resolve the outstanding tax liability with the [IRS] and has implemented that plan by making an initial payment of $154,962. The plan includes restructuring the financial obligations of the College and using the equity in the real estate to pay a substantial portion of the IRS obligation. *Any remaining balance due to the IRS will be addressed through the request for an Offer in Compromise.*
>
> You have implemented a satisfactory plan to resolve the outstanding tax obligations of the College and we appreciate your efforts.

On November 20, 2014, the College appeared before the Commission to make the case for reaffirmation of accreditation. *See id.* at 3410-3481 (transcript of proceeding); *see also* Wirt Testimony, Ex. 47 at 63. Specifically, the College was represented by Dr. Simmons; Donald Hutchins, Vice-President for Administrative and Fiscal Affairs at SDC; Oliver Patrick Scott, Chairman of SDC's Board of Directors; and Jay Vaughn, counsel for SDC. Record of Appeal, Def.'s Ex. 45 at 3410-11. Dr. Simmons stated his belief that the College's accomplishments had "gotten lost in the discussion focused solely on what has evolved into a checklist." *Id.* at 3421. He maintained that the Commission's warning and show cause actions had a severe "adverse impact" on the College. *Id.* at 3424-25. He also noted that changes in the federal Pell Grant program "had a substantial impact." *Id.* at 3435. In addition, Dr. Simmons asserted that, had the College been permitted to move forward with its plan for online education in 2011, he had "no doubt" that "there would be no need" for his presence before the Commission that day. *Id.* at 3437.

With respect to the Sale/Leaseback Plan, Dr. Simmons represented that a purchaser remained ready to complete the transaction once the Commission affirmed the College's accreditation. Further, he stated that the purchaser would "waive the tax contingency" in the sales agreement, and that the IRS had "agreed to subordinate its position" with respect to the secured property "to allow the sale to take place." Record of Appeal, Def.'s Ex. 45 at 3439. However, upon questioning, one of the Commissioners observed that no documentation of these representations was before the Commission. *Id.* at 3477. Dr. Simmons responded, *id.* at 3446-47:

> We did everything we were told. And for the one remaining element did everything we could while we remain in this accreditation status. If we're not allowed to continue it is because of what you think we can't do instead of what we have already done and are doing. … Give us a year until the next comprehensive visit and we can show you remarkable things.

In a lengthy letter dated November 21, 2014, the Commission informed the College that it had determined to withdraw the College's accreditation, effective June 30, 2014. *See* ECF 1-14 ("Withdrawal Letter"); *see also* Motion Hearing, Def.'s Ex. 36 (same). The Commission explained that the decision was "based on" all of the reports and responses, discussed *supra*, which it detailed by date. ECF 1-14 at 1, 3-4.[19] It noted that "its concerns about the financial

---

[19] The first paragraph of the Withdrawal Letter states as follows, ECF 1-14 at 1:

> At its session on November 20, 2014, the Middle States Commission on Higher Education acted as follows:

> To withdraw accreditation from Sojourner-Douglass College effective June 30, 2015. This decision is based on the institution's June 1, 2011 Periodic Review Report, the report of peer reviewers, and the institutional response to the peer reviewers' report; the institution's September 1, 2012, monitoring report, the report of a subsequent visit by Commission representatives on September 19, 2012, and the institution's response to

viability of [the College] are long-standing," and that the Commission had granted the College a "one-year extension for good cause in November, 2013," which represented "the maximum amount of time stipulated in its policy on 'Range of Actions.'"  ECF 1-14 at 3.

Further, the Commission set forth "[e]xamples of the specific bases for the Commission's action."  *Id*. at 2.  It observed that "[t]o be eligible for reaffirmation of accreditation, an institution must demonstrate that it meets or continues to meet" the Commission's Requirements and Standards.  *Id*.  The Commission "found deficiencies in relation" to Requirement of Affiliation numbers 5 and 8, and Commission Standard 3.  *Id*.

Middle States reviewed the procedural history described above and its findings as to the College's evidence on each of the Six Points.  *Id*. at 3-5.  The Commission essentially reiterated the concerns expressed in the September 2014 Report.  *Id*.  These included the same concerns with the College's budget projections and the contingencies holding up the Sale/Leaseback Plan, *id*. at 4, and the terms of the College's refinancing of its American Bank Debt.  *Id*. at 5.  The Commission acknowledged that the College had provided an external audit for the period ending June 30, 2013 which "removed the going concern opinion" found in the FY 2013 audit.  *Id*. at 5.

---

the representatives' report; a second monitoring report submitted by the institution on November 1, 2013, the report of a subsequent visit by Commission representatives on December 17, 2013, and the institution's response to the representatives' report; and a substantive report submitted by the institution on September 1, 2014, the report of a subsequent visit by Commission representatives on September 22, 2014, the institution's response to the representatives' report, and additional information submitted by the institution on November 11, November 14, and November 19, 2014, and provided during a Hearing before the Commission on November 20, 2014.  These and prior institutional reports and responses have failed to document that the institution has achieved and can sustain ongoing compliance with the Commission's Requirement of Affiliation #5, Requirement of Affiliation #8, and with Commission Standard 3 (Institutional Resources).

With respect to the College's tax obligations, the Commission offered the following analysis, ECF 1-14 at 5:

> As of the date of the most recent small team visit … , the College was unable to document the implementation of a plan for the repayment of its outstanding state or federal taxes.  Furthermore, the IRS has placed tax liens on the College's real estate holdings.  As noted above, the College submitted a letter on November 14, 2014 asserting that it had reached an agreement in this matter with the Comptroller of the State of Maryland.   In that same letter, the College acknowledged that no repayment plan had yet been accepted by the [IRS].  The November 19 letter from the [IRS] noted that the College has an interim payment arrangement but has yet to request an Offer in Compromise to settle the outstanding debt and remove the liens from the real estate.  Beyond the fact that these unpaid taxes (plus interest and penalties) represent a considerable debt burden, [the College] did not present the Commission with clear evidence of compliance with federal and state tax policies, regulations and requirements.

On December 1, 2014, via a letter from Dr. Simmons to the Commission, and in accordance with the Commission's "Procedures for Appeals from Adverse Accrediting Decisions," the College appealed the Commission's decision to withdraw accreditation.  *See* ECF 11-4 (appeal letter); *see also* ECF 15-5 (copy of Commission's policy regarding "Appeals from Adverse Accrediting Decisions") ("Appeal Policy").  According to the Appeal Policy, the "purpose of the Appeal" is "to provide an independent review to make certain that the Commission's action was not arbitrary and capricious and the accreditation process was conducted in accordance with the policies and procedures of the Commission."  ECF 15-5 at 4.

The Panel's review is limited to "the Record and the condition of the Appellant existing at the time of the Commission's decision."  *Id.* at 4.  However, the Chair of the Panel, *see id.* at 7, may admit "new and verifiable information relating to changes in the institution's financial status."  ECF 15-5 at 4.  But, "such information" may "only be offered if (1) the information was not available to the institution at the time the Commission voted for the adverse action, and (2)

the information [was] deemed to be so substantial and material that had it been available it is likely to have had a bearing on the decision of the Commission to issue an adverse decision." *Id.*

The Panel has "authority to affirm, remand or reverse the accrediting action." *Id.* at 8. But, the Appeal Policy directs the Panel to "affirm the Commission's decision unless the Appellant provides, by clear and convincing evidence, that the Commission's evidence was arbitrary and without substantial evidence in the Record or that there was an error in the proceedings of the Commission that materially affected its decision." *Id.*

A representative of the Commission selected a panel of three persons to hear the College's appeal, *id.* at 2, from a roster of sixteen persons "with substantial experience and participation in the education community and accreditation process," none of whom was a member of the Commission. *Id.* at 1. The College submitted a written statement dated December 30, 2014, in support of its appeal, along with a number of exhibits. *See* ECF 1-15. The Commission submitted a written response, dated January 14, 2015, also with a number of exhibits. ECF 15-2 through ECF 15-10; *see also* Motion Hearing, Def.'s Ex. 37 (same).

On February 2, 2015, the Panel held a hearing on the College's appeal. *See* Motion Hearing, Def.'s Ex. 48 (transcript of appeal hearing) ("Appeal Transcript"); ECF 1-16 (report of appeal panel) ("Appeal Decision"); *see also* Motion Hearing, Def.'s Ex. 39 (same). Joseph Bascuas, Ph.D., a visiting professor of psychology at Florida Gulf Coast University, served as Chair of the Panel. Motion Hearing, Testimony of Joseph Bascuas ("Bascuas Testimony"), ECF 47 at 133-36. At the Motion Hearing, Dr. Bascuas explained that the Panel heard arguments from both the College and the Commission, ECF 47 at 150, and "had access to the entire record … going back to 2011, of all the different action letters and different reports … ." *Id.* at 139. It

also had the Record of Appeal, Def.'s Ex. 45 (record submitted by Commission administrator to Panel). *See also* Appeal Policy, ECF 15-5 at 1-2 (stating administrator compiles the "Record").

The College sought to introduce new evidence at the appeal hearing. Specifically, it sought to introduce "two letters" from the IRS, one letter from the "Maryland Higher Education Commission," Appeal Transcript, Def.'s Ex. 48 at 9, and a "copy of a presentation" that included "prospective" financial information "based upon subsequent events between the Commission hearing" of November 20, 2014 and the appeal hearing. *Id.* at 9-10; *see also* Appeal Decision, ECF 1-16 at 2 (describing letters).

SDC submitted a copy of the presentation at issue as an exhibit at the Motion Hearing. *See* Pl.'s Ex. 13. The presentation was prepared by Carl Marks Advisors.[20]  *Id.* at 1. The presentation contains SDC's revenue and expenses for the months of July 2014 through December 2014, *id.* at 4; monthly revenue and expense projections for January 2015 through June 2015, *id.* at 5; a comparison of actual budget numbers from 2014 with projected numbers for 2015, *id.* at 6; quarterly projections for fiscal years 2016 and 2017, *id.* at 7; a description of assumptions made, *id.* at 8-11; a "balance sheet" projecting the "impact" of the Sale/Leaseback Plan, if consummated, *id.* at 12; a table indicating the "sources and uses of Sale/Leaseback Transaction" monies, *id.* at 13; and a list of "risks and opportunities". *Id.* at 14.

At the Motion Hearing, Dr. Bascuas testified that he believed, pursuant to federal regulations and the Commission's policy, ECF 47 at 145-46, that new evidence could only be admitted under "certain conditions," ECF 47 at 145, namely, the evidence had to be "[s]ubstantive and material; new, meaning had not been available on November 20th; and, most

---

[20] Another of plaintiff's exhibits indicates that the full name of the report's author is Carl Marks Advisory Group LLC. *See* Motion Hearing, Pl.'s Ex. 12.

important to [the Panel], verifiable." *Id.* at 196; *see also* Appeal Transcript, Def.'s Ex. 48 at 30; 34 C.F.R. § 602.25(h)(1).

After a brief recess to deliberate, the Panel decided to admit the letters, but not the presentation. Appeal Transcript, Def.'s Ex. 48 at 12-36. The Panel determined that the presentation "talk[ed] about the condition of the College going forward," *id.* at 13, and was not relevant to the Panel's charge to decide whether "the decision that the Commission made" was "appropriate based on what was in front of them at the time." *Id.* at 12. The Panel also determined that the information was not "verifiable," *id.* at 13, as required by the Commission's Appeal Policy. *See id.* at 30; ECF 15-5 at 4. Dr. Bascuas explained: "[I]t's not verifiable because it can happen—it can only happen in the future." Appeal Transcript, Def.'s Ex. 48 at 13. Counsel for SDC objected to the Panel's ruling.

At the conclusion of the discussion on new evidence, counsel for the College reiterated an objection lodged by telephone call to Dr. Bascuas the night before the appeal hearing. *See* Bascuas Testimony, ECF 47 at 144. Specifically, SDC's lawyer objected to the fact that the attorney available to the Panel for consultation, Jean Hemphill, was the same attorney who had served as counsel to the full Commission when the College appeared before the Commission on November 20, 2014. *See* Appeal Transcript, Def.'s Ex. 48 at 22-23; *id.* at 2; Bascuas Testimony, ECF 47 at 142-43; Record of Appeal at 3411 (transcript of Nov. 20, 2014 meeting). At the Motion Hearing, Dr. Bascuas testified that the Panel did not consult Ms. Hemphill during the hearing, nor did it discuss the "merits" of either side's position with her. ECF 47 at 144.

In a written opinion dated February 10, 2015, the Panel issued its decision affirming the Commission's decision to withdraw the College's accreditation. Appeal Decision, ECF 1-16.

The Appeal Decision stated, *inter alia*, *id.* at 3: "Based on a careful and thorough review of the record, including the Appeal-specific written and oral presentations, the Appeal Panel unanimously concluded that Sojourner-Douglass College did not provide clear and convincing evidence that the accreditation action taken by [the Commission] on November 20, 2015 was capricious or arbitrary." The Panel's specific reasoning focused on failure and insufficiency of the Sale/Leaseback Plan, and SDC's continuing failure to pay federal taxes. *Id.* at 2-3. It stated, *id.* (emphasis in original):

> SDC confirmed to the Appeal Hearing Panel that the primary strategy to resolve its current illiquid financial position is the sale/leaseback of its real estate holdings. However, the executed contract included in the Record stipulates that the sale/leaseback cannot occur without the release of the Federal Tax Liens and the reaffirmation of the SDC's accreditation by MSCHE.
>
> SDC asserted that the proceeds from the sale/leaseback would yield approximately $11,556,000 which would be used to pay both its first and second mortgage obligations, the initial federal tax lien of $948,612 (***which included approximately $300,000 of unpaid federal tax withholdings for the 4th quarter of 2014***), and generate approximately $951,000 in cash infusion for working capital. An examination of the Records by the Appeal Hearing Panel, revealed the following:
>
> | | |
> |---|---|
> | SDC first mortgage (American Bank) | = $9,653,272.43 @ August 28, 2014 |
> | SDC second lien (bridge loan) | = $2,000,000.00 |
> | Payroll tax, interest and penalties | = <u>$7,034,578.00</u> @ June 30, 2014 |
> | **Total** | **= <u>18,687,850.43</u>** |
>
> Based on the facts stated above, it is clearly evident to the Appeal Hearing Panel that the anticipated proceeds of $11,556,000 from the sale/leaseback transaction will not produce adequate cash infusion to satisfy SDC's first and second mortgage obligations that are liens on the property, pay the initial Federal Tax payment of $948,612 and generate excess cash of $951,000 for working capital. In-addition [sic], SDC did not provide any evidence to the Appeal Hearing Panel of a plan that was satisfactory to the IRS for the payment of unpaid federal taxes that SDC withheld from its employee paychecks for a number of years. It is important to note that during the Appeal Hearing, SDC acknowledged that it had again failed to remit withheld payroll taxes for the fourth quarter of 2014.

As stated, the College filed the instant suit against the Commission late in the evening of June 29, 2015.  ECF 2.  On June 30, 2015, I denied the College's TRO Motion, *see* ECF 6 (Order), and the Commission withdrew the College's accreditation.  *See*, *e.g.*, ECF 15-23.  On the same day, the State of Maryland notified the College that it "is no longer approved to operate in the State of Maryland, commensurate with its loss of accreditation … ."  ECF 15-22 (letter from Maryland's Acting Secretary of Higher Education to College, dated June 30, 2015).  On July 1, 2015, the USDE informed the College that it is no longer eligible "to participate in the student financial assistance programs authorized pursuant to Title IV" of the HEA.  ECF 15-23 (letter from USDE to College, dated July 1, 2015).

## II. Discussion

As indicated, *supra*, the College alleges four counts against the Commission: 1) denial of federal common law due process ("Count I"); 2) discrimination in the enforcement of contract in violation of 42 U.S.C. § 1981 ("Count II"); 3) breach of contract ("Count III"); and 4) negligence ("Count IV").  ECF 2 at 24, 26-28.  The College seeks a preliminary injunction only on the basis of Count I; at this stage in the litigation, it does not seek relief with respect to Counts II, III, or IV.  *E.g.*, ECF 39 at 5 n.1.

The College argued at the hearing on its TRO Motion and in its legal memorandum supporting the PI Motion that the Commission acted with racial bias; that its decision was arbitrary because it reflected "a double standard" favorable to "Predominantly White Institutions," ECF 1-1 at 2; and that "race" was a "factor" in the "assessment" of SDC.  *Id.* at 6.  Moreover, SDC argued that the Commission's decision "troublingly flags race."  *Id.* at 8.  *See also* ECF 1-17 (supporting affidavit of Kareem Aziz, an administrator at SDC); ECF 11 at 1

(relying on ECF 1-1 and ECF 1-17).   However, the College eventually abandoned this line of

argument at closing argument on August 17, 2015.   And, the College made clear at the Motion

Hearing that its argument as to Count I "has nothing to do with whether [MSCHE] had all the

facts", *i.e.*, on whether the Commission had substantial evidence to support its decision.   *See*

Motion Hearing, ECF 47 at 219 (argument of SDC's counsel); *see also* Memo, ECF 1-1 (arguing

MSCHE's decision was arbitrary and capricious, but not arguing MSCHE lacked substantial

evidence for its decision); ECF 16 at 3-5 (SDC Reply); ECF 14 (transcript of TRO hearing) at

19-20.

Accordingly, the PI Motion presents only the questions of whether the College is entitled

to preliminary relief based on its claim that the Commission's decision to withdraw accreditation

was arbitrary and capricious because the Commission failed to adhere to its own standards and/or

procedures;   instead,   it   created   "moving   targets   and   circular,   impossible-to-fill   *post hoc*

requirements" that were "fundamentally unfair" because they amounted to new terms for which

SDC had no notice.   ECF 16 (SDC Reply) at 4.   *See also*, *e.g.*, ECF 47 at 219 (argument of

SDC's counsel) ("The question before the Court is:   Did [MSCHE] change the standards that it

articulated to Sojourner that it was going to use to assess its compliance?").

I will discuss the PI Motion first, then briefly address evidentiary objections raised at the

Motion Hearing, then turn to defendant's Motion to Dismiss Counts II and III.

### A.  Motion for Preliminary Injunction

A preliminary injunction is an extraordinary and drastic remedy.   *See Munaf v. Geren*,

553 U.S. 674, 689-90 (2008).   As the Fourth Circuit observed in *Centro Tepeyac v. Montgomery

Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013), a preliminary injunction involves "the exercise of a

very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." (Quotation marks and citation omitted.)   It is a remedy that is "'is granted only sparingly and in limited circumstances.'"   *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted).

To obtain injunctive relief, the claimant must establish that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest."   *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 19 (2008).   All four requirements must be satisfied.   *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam).   Under *Winter*, 555 U.S. at 22, the party seeking the preliminary injunction must make a "clear showing" that SDC is likely to succeed on the merits.   *See also Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011).

In my view, the College has failed to make a clear showing that it is entitled to such extraordinary relief with respect to Count I.   In particular, I am not persuaded that SDC is likely to succeed on the merits of its claim.

"Congress has given exclusive jurisdiction to United States district courts over 'any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency ... involving the denial, withdrawal, or termination of accreditation.'" *Prof'l Massage*, *supra*, 781 F.3d at 170 (quoting 20 U.S.C. § 1099b(f)).   The HEA, "which governs the administration of federal student aid programs and the accreditation of institutions of

higher education," does not provide a private right of action against accreditation agencies.  *Id.*[21]

And, because accreditation agencies "are private entities, not state actors," they are "not subject

to the strictures of constitutional due process requirements." *Id.*

Nonetheless, "there exists a 'common law duty on the part of 'quasi-public' private

professional organizations or accreditation associations to employ fair procedures when making

decisions affecting their members.'" *Prof'l Massage*, 781 F.3d at 169 (quoting *McKeesport*

*Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 534-35 (3d Cir. 1994)).

The common law duty has "several underpinnings," including the gatekeeping-nature of the

agencies' roles under the HEA, as discussed, *supra*, and the HEA's grant of exclusive federal

jurisdiction over accreditation disputes.  *Prof'l Massage*, 781 F.3d at 170.   The duty, "put

simply, is to play it straight." *Id.*

"[R]ecognition that such a common law duty exists does not authorize courts to

undertake a wide-ranging review of decisionmaking by accreditation agencies." *Id.*   The

"judicial inquiry" is limited, "drawing on principles of administrative law and judicial

deference." *Id.*  As the Fourth Circuit explained in *Professional Massage*, "due process claims

dovetail nicely with administrative law concepts . . . because the prominent point of emphasis of

due process is one of procedure." *Id.* at 172.   Thus, a reviewing court may consider "'only

whether the decision of an accrediting agency … is arbitrary and unreasonable or an abuse of

discretion and whether the decision is based on substantial evidence." *Id.* at 171 (quoting

*Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 712 (6th Cir. 2006)).   As the

Fourth Circuit has said, "[w]hen adjudicating common law due process claims against

---

[21] The HEA does provide "for suit by or against the Secretary of Education." *Prof'l Massage*, 781 F.3d at 170.

- 56 -

accreditation agencies, courts should focus primarily on whether the accrediting body's internal rules provided a fair and impartial procedure and whether it followed its rules in reaching its decision." *Prof'l Massage*, 781 F.3d at 172 (citation and alterations in *Prof'l Massage* omitted) (alteration added by this Court).

Notably, courts are "'not free to conduct a *de novo* review or to substitute their judgment for the professional judgment of the educators involved in the accreditation process.'" *Id.* at 171 (citation omitted).   Rather, the reviewing court must "confine" itself "to the record that was considered by the accrediting agency at the time of the final decision." *Id.* at 174-75.   The standard also commands "significant, though not total, deference to decisionmaking by accreditation agencies." *Id.* at 169.  This deference respects "the accreditation agency's expertise and knowledge" in the field. *Id.* at 171. Indeed, reviewing courts have consistently emphasized that "'standards of accreditation are not guides for the layman but for professionals in the field of education.'" *Id.* at 171 (quoting *Wilfred Academy of Hair & Beauty Culture v. The Southern Assoc. of Colleges & Schools*, 957 F.2d at 214 (5th Cir. 1992) (additional citation omitted)).  As the *Professional Massage* Court said, 781 F.3d at 171:  "[I]t is not realistic to think courts possess either the expertise or the resources to perform the accreditation function *ab initio*."

That said, the Fourth Circuit "has made clear that an impartial decisionmaker is an essential element of due process." *Id.* at 177 (citations omitted).  Therefore, consistent with principles of federal administrative law, a court "may be justified in conducting a more searching inquiry into the motivations of administrative decisionmakers in the case of 'a strong showing of bad faith or improper behavior.'" *Id.* at 177-78 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430

U.S. 99 (1977)).  A strong showing of bad faith or improper behavior may "justify departure from the deferential standard ordinarily due to the accreditation agency under a common law due process claim."  *Id*. at 180.  But, the claimant's showing must be measured against the "presumption of honesty and integrity" ordinarily due to administrative decisionmakers.  *Id*. at 178 (citations omitted).

In this case, as stated, SDC initially alleged, among other things, racial bias in the withdrawal of accreditation.  That claim was abandoned at closing argument.  At this juncture, SDC presses the claims that it was denied due process as to the Commission's decision to withdraw the College's accreditation, and that the Commission's decision was arbitrary and capricious.  *See* ECF 16 (SDC Reply) at 3.  The College asserts:  "Under the federal common law right of due process that is owed to [the College], MSCHE could not simply impose arbitrary, ever-changing requirements to satisfy the broad economic stability requirements of the accreditation standards."  *Id.*  Relying on "[b]asic principles of administrative law apply," SDC contends that "one of those tenets is that the goalposts cannot be moved in the middle of the game without fair notice and opportunity to address" changes in requirements.  *Id*. at 4.  As SDC puts it, MSCHE "made [the College] jump through all of these hoops only to be told, just as it was nearing the finish line, that MSCHE would not provide any consents . . . and that the lack of such relief meant that accreditation had to be denied."  ECF 16 at 5.

In particular, the College complains that the Commission's decision to withdraw accreditation was arbitrary and capricious because the Commission made its decision based on standards that the Commission repeatedly "changed over time," without affording the College notice of the change and "due opportunity to respond *before* an adverse decision."  SDC Facts

Reply, ECF 39 at 3-4 (emphasis in original).   According to SDC, it "produced documented evidence" on each of the Six Points set forth in the Commission's December 2013 Report and the Show Cause Letter, *see* PI Reply, ECF 16 at 5-7, but the Commission "rejected [the College's] proffered documented evidence on considerations other than those specified in the March 6, 2014 Commission Action," *i.e.*, the Show Cause Letter.   *Id*. at 6-7.   SDC adds: "Such arbitrariness is precisely what 'moving the goal posts' involves."   ECF 39 at 4.

In response, the Commission argues that its standards never changed.   Specifically, the Commission states in its Opposition:   "In documenting its decision to revoke accreditation, the Commission addressed each of the six requirements outlined nine months earlier and found SDC had presented substantial evidence of compliance with only one" of the six requirements.   ECF 15 at 25.   Moreover, the Commission asserts that the overall guiding criterion was always whether the College could show compliance with Standard 3, *i.e.*, whether it could show that it currently possessed the financial resources necessary to achieve its mission and goals.   *E.g.*, *id.* at 6, 10, 12, 14, 23; *see also* ECF 14 (transcript of TRO Hearing) at 31, 33.   According to the Commission, it made clear to the College that the Commission was not asking the College to complete a checklist; rather, the Commission needed the College to show, with documentary evidence, that, as of November 20, 2014, it was financially viable and also financially sustainable in the long-term.

In its Reply, the College tucked assorted arguments, framed as objections (*see* ECF 39) to the Commission's proposed findings of fact and law.   *See* ECF 38.   There, it asserts that Middle State's "policy limiting the time for resolving an accreditation dispute cannot supersede common law due process."   ECF 39 at 8.   This argument appears to depend on the College's contention

that the Commission changed its requirements near the end of the review process.  The College

argues that, accordingly, "[d]ue process would dictate new time for response following this

refinement of the earlier notice."  *Id.* at 9.  In effect, this would amount to an extension of the

three-year period granted to the College to show compliance with Standard 3.  *Id.* at 8-9.

Additionally, SDC asserts:  It "is a denial of fundamental fairness for MSCHE … to deny

[accreditation] solely to justify its own decision-making."  *Id.* at 10.  In this regard, the College

argues:  "MSCHE itself has been the only obstacle in the way of the College's completing" the

Sale/Leaseback Plan "that MSCHE directed [the College] to complete."  *Id.* at 11.  In the

College's view, if only the Commission had reaffirmed SDC's accreditation, then the only

contingency preventing the College from closing the contracts underlying its Sale/Leaseback

Plan would have been removed; the sales would have gone through; the IRS would have lifted its

liens on the property; the College would have paid a substantial enough amount to the IRS that

the IRS would have entered into an Offer in Compromise; the College would have been able to

pay off its American Bank Debt and other loans secured by the properties; the College would

have had enough working capital to sustain and expand its operations; and the College's growing

budget would soon result in regular budget surpluses.  *Id.* at 10-11, 2-3.  It concludes:  "No

decision-making body with a specific regulatory mission may, consistent with due process,

withhold its consent for no supportable reason other than willfulness."  *Id.* at 11.

Finally, the College also contends that the appeal hearing violated due process.  It argues

that the "College's showing of compliance at the Appeal Hearing was arbitrarily blocked by the

evidentiary rulings of the [Panel]."  ECF 39 at 12; *id.* at 12-21.  And, in a footnote, it vaguely

implies that the Panel's use of the same attorney who represented the Commission when it decided to withdraw accreditation "raises questions." *Id.* at 13 n.4.

The Commission has not responded to these last three claims in its written submissions, presumably because the College first asserted them its Reply to the Commission's proposed findings of facts and law.

I will address the College's "moving goalposts" argument, and then its additional assertions.

## 1. "Moving Goalposts"

As noted, the College argues vigorously that it was denied due process because it was not afforded notice and an opportunity to respond to arbitrarily changing accreditation criteria. The contention borders on specious.

Contrary to SDC's assertions, the issue is not that Middle States was unhappy because SDC has substantial debt. The matter concerned SDC's inability to service its debt. The record overwhelmingly showed that the Commission followed its own procedures as well as federal regulations, essentially to a tee; that it repeatedly made clear, in writing and through interactive dialogue, that it was concerned about the College's financial status, including its prolonged inability to pay its bills, such as State and federal taxes; and that it ultimately decided to withdraw accreditation when, within extended timelines set by the Commission and federal regulations, the College could not execute the turn-around plans the College set for itself. Middle States afforded SDC ample notice of its decisionmaking criteria and the opportunity to respond, and there was nothing otherwise arbitrary or capricious about the process.

The basis for this conclusion is outlined at length in the Factual Background.  But, by way of example, I will recap the evidence with respect to just one of the grounds for the Commission's Withdrawal Decision, *i.e.*, the College's failure to implement a plan to resolve its liability to the IRS for years of unpaid employee-withholding taxes.[22]

Representatives of the Commission first learned of, and expressed concern about, the College's federal tax liabilities in the Summer of 2011.  See, *e.g.*, August 2011 Report, Record of Appeal, Def.'s Ex. 45 at 123.  Notably, the College itself offered as early as August 2011 that it "expect[ed] to resolve" its debt with the IRS "during fiscal year 2012."  2011 Response, Record of Appeal, Def.'s Ex. 45 at 136.  Nonetheless, in September 2012—more than one year later— peer reviewers found that the College had both "current as well as prior year" tax obligations that were outstanding, and that "negotiations for a repayment schedule" had been "held but not concluded."  September 2012 Report, Def.'s Ex. 45, Record of Appeal at 2339.  At this point— again, a year after the College itself had represented it would resolve the matter, but did not do so—peer reviewers asked the College to conduct an external audit to determine "total outstanding liability to the IRS," and added that the audit "should be used to develop a repayment plan for the outstanding obligation and to detail strategies that the College will implement to remain current with its Federal withholding tax obligations."  *Id.* at 2340.

In SDC's response to the September 2012 Report, the College did not dispute the need for it to complete the audit, or to enter into a repayment plan.  Nor is there any evidence that

---

[22] The College also owed State taxes, and submitted a repayment plan to resolve those obligations.  *See* Record of Appeal, Def.'s Ex. 45 at 3406 (letter of November 14, 2014, from the Comptroller of Maryland reporting that the Comptroller received a deposit of $101,000.00 and acknowledging a repayment plan calling for $5,000 payments per month plus a set percentage of certain State grant money).

SDC did not understand the meaning of the directive.  *See* Record of Appeal, Def.'s Ex. 45 at 2347-2356.  The College, in fact, expressly accepted "the team's requirement to have an external tax audit," *id.* at 2350, and represented that it had hired a firm "to negotiate a payment plan acceptable to the IRS and College as well as monitor the timely deposit of withholding taxes." *Id.*

Roughly one year later, in the College's Second Monitoring Report, submitted in November 2013, the College again expressly acknowledged the Commission's concern about SDC's tax liabilities.  *See* Record of Appeal, Def.'s Ex. 45 at 2371.  The College put that concern into context, and in its own words, stating, *id.*:  "[The 2012 Warning Letter] came as a result of the following concerns noted during the site visit and evidence submitted:  that the College would not be able to repay all liabilities including the IRS debt while demonstrating an ability to remain current with all payments … ."

By November 2013, the College still had not been able "to establish a repayment plan" with the IRS.  *Id.* at 2375.  But, it explained that its agent would begin negotiations "expeditiously," *id.* at 2381, and that its "goal" was to "establish an 'offer and compromise' settlement plan with the IRS" that would "reduce the amount of penalty and interest that has accrued."  *Id.* at 2375.  In response, in the December 2013 Report, a second round of peer reviewers recommended that the College be required to "provide documentation" with its next report to the Commission, showing "the implementation of a satisfactory plan for the repayment of unpaid federal and state taxes, interest and penalties" as well as, *inter alia*, "implement[ation] [of] a financial planning and budgeting process … that … demonstrates that the institution has

sufficient resources to carry out its mission and execute its plans."   December 2013 Report, Record of Appeal, Def.'s Ex. 45 at 2795.

In response to the December 2013 Report, the College again expressly "accept[ed] the challenges to make improvements where they are indicated," and agreed to "provide documentation," as requested.   2014 Response, Record of Appeal, Def.'s Ex. 45 at 2799. Nonetheless, ten months later, in September 2014, SDC did not produce evidence of a repayment plan with the IRS, nor had it paid all taxes that had come due in 2014.   *See* September 2014 Report, Record of Appeal, Def.'s Ex. 45 at 3177 (reviewing 2014 Substantive Report and reporting that the College "had not executed an agreement with either federal or state [tax] authorities, and that it had "accrued additional unpaid federal and state payroll tax liabilities in 2014").   Further, the College contemporaneously represented, without explanation, that it believed it would reduce its tax debt, then "in excess of $7M," to a liability of only $2 million through an offer in compromise.   *Id*.

As late as November 19, 2014—one day before the full Commission was to make its final decision on whether to withdraw accreditation—the College provided a letter from the IRS (ECF 1-14), "confirm[ing] that [the College] has established a plan to resolve the outstanding tax liability . . . and [it had made] an initial payment of $154,962."   Record of Appeal, Def.'s Ex. 45 at 3408.   The letter further stated:   "The plan includes restructuring the financial obligations of the College and using the equity in the real estate to pay a substantial portion of the IRS obligation.   Any remaining balance due to the IRS will be addressed through the request for an Offer in Compromise."   *Id.* The next day, the College responded to the Commission's requests for additional explanation of the plan, with little additional detail.   Specifically, Dr. Simmons

stated: "With the [IRS] we will make long-term payments until such time that we enter into the

sale lease back. At which time we will enter into an offer and compromise." Def.'s Ex. 45,

Record of Appeal, Def.'s Ex. 45 at 3455 (transcript). He added: "[W]e owe approximately $6 to

$7 million, of which over $2 million of that is penalties. The discussion we've had with them

[*i.e.*, the IRS] is that we would offer approximately $2 million to resolve the matter." *Id.* at

3456. However, the record is devoid of any assurance or even an indication that the IRS would

accept that sum in satisfaction of the debt.

In its Withdrawal Decision, issued November 21, 2014, the Commission made clear that

its determination that SDC was not in compliance with Standard 3 was "based on" the totality of

the record. *See* Withdrawal Letter, ECF 1-14 at 1. But, it also gave "examples of the specific

bases for the Commission action," *id.* at 2, including the following, *id.* at 5:

> As of the date of the most recent small team visit … , the College was unable to
> document the implementation of a plan for the repayment of its outstanding state
> or federal taxes. Furthermore, the IRS has placed tax liens on the College's real
> estate holdings. As noted above, the College submitted a letter on November 14,
> 2014 asserting that it had reached an agreement in this matter with the
> Comptroller of the State of Maryland. In that same letter, the College
> acknowledged that no repayment plan had yet been accepted by the [IRS]. The
> November 19 letter from the [IRS] noted that the College has an interim payment
> arrangement but has yet to request an Offer in Compromise to settle the
> outstanding debt and remove the liens from the real estate. Beyond the fact that
> these unpaid taxes (plus interest and penalties) represent a considerable debt
> burden, [the College] did not present the Commission with clear evidence of
> compliance with federal and state tax policies, regulations and requirements.

Now, before this Court, based on the language contained in the Show Cause Letter and

the Commission's explanation in the Withdrawal Decision, the College argues that the

"goalposts" have shifted because, *inter alia*, it believes the Commission changed its accreditation

criteria by requiring evidence of a payment plan or an Offer in Compromise with the IRS,

satisfactory to the Commission, when it had only asked for evidence of "a plan," and which SDC obtained and produced. *See*, *e.g.*, ECF 39 (SDC's reply to MSCHE's proposed facts) at 17 ("In its [Withdrawal Decision], MSCHE rejected the [College's plan] because the College had failed to present an Offer in Compromise. Nothing in the Commission Action of March 6, 2014 requested for anything more than a plan. To the extent that MSCHE wanted more, this added showing was a new requirement … ."); Motion Hearing, Testimony of Dr. Simmons, ECF 44 at 42 ("Middle States asked us to develop a plan with the Internal Revenue to pay it back. Middle States … did not ask us to submit an installment plan.").

This argument is unpersuasive because it rips the Commission's tax-plan directive out of both the specific and general contexts in which it was issued. Specifically, even if the Commission's decision was based on this one issue alone, the College's *own* representations show that it had notice that the Commission was looking for something like an "installment plan" and/or an Offer in Compromise, because *that is what the College said it would provide*. *See* Record of Appeal, Def.'s Ex. 45 at 2350 (2012 institutional response); Second Monitoring Report, *id.* at 2375. Further, SDC had repeated opportunities to respond to the stated requirement, and each time, it accepted the Commission's findings and agreed to provide the requested documentation. *See*, *e.g.*, 2014 Response, Def.'s Ex. 45, Record of Appeal at 2799.

Generally, and more important, the College's own documents show that, at least by November 2013, it understood the Commission's basic concern with respect to tax debt to be "that the College would not be able to repay all liabilities including the IRS debt while demonstrating an ability to remain current with all payments … ." Second Monitoring Report, Record of Appeal, Def.'s Ex. 45 at 2371. The conclusory letter from the IRS that SDC provided

to the Commission on November 19, 2014, stating that the College had a plan, does not in any way address the longstanding, underlying concern as to the College's ability to pay its bills.

SDC seems to contend that so long as it had a plan with the IRS, it fulfilled the requirement set by MSCHE.  In other words, SDC suggests that whatever plan it had, regardless of its terms, automatically satisfied MSCHE's requirements, because it was a plan.  *E.g.*, Motion Hearing, Testimony of Dr. Simmons, ECF 44 at 42.  From SDC's perspective, Middle States had no basis to review the merits of a plan, so as to determine its effect on other obligations of the College.  This position defies logic.  Clearly, the Commission was entitled to know the parameters of a plan with the IRS and had a duty to consider its terms and its implications for the College.  If the College had a plan, hypothetically, to pay almost all tuition revenue to the IRS, so as to satisfy the IRS, such a plan would severely affect other components of SDC's operations.  Therefore, the Commission had to consider the terms of a plan.

In addition, and at an even more basic level, the College's narrow focus on its compliance with the Six Points set forth in the Show Cause Letter misrepresents the bigger picture, *i.e.*, the Commission's unambiguous and unwavering requirement that the College demonstrate, within the timeframes set, *current* compliance with Standard 3.

At the Motion Hearing, the College argued that Standard 3 is worded too vaguely to provide notice in accord with due process.[23]  The Fourth Circuit has made clear, however, that the common law duty of due process does not require an accrediting agency to outline "specific numerical goals."  *Professional Massage*, 781 F.3d at 174.  Accrediting agencies' standards

---

[23] According to my notes, SDC advanced this argument on August 17, 2015, the last day of the Motion Hearing.  The transcript for the final day of the Motion Hearing has not been filed as of the date of this Memorandum Opinion.

"must maintain a balance between specificity, to provide notice to those seeking accreditation, and generality, to allow itself flexibility in accrediting varied institutions ranging over many different fields and disciplines."

In sum, I see no evidence that the Commission acted arbitrarily or capriciously by shifting the "goalposts" set for the College, or that the College was deprived of notice or an opportunity to be heard with respect to the Commission's reasons for withdrawing its accreditation.  It is quite clear that the College disagrees with the Commission's decision, and that the two sides see the facts presented to the Commission very differently.  However, it is not my place to second-guess the Commission's conclusion as to what those facts required it to do. *See*, *e.g.*, *Professional Massage*, 781 F.3d at 171.

## 2.  Additional Assertions

As stated, SDC also argued in its Reply to Middle States's proposed findings of fact and law that Middle States was arbitrary and capricious in its decision not to extend further SDC's deadline for compliance, ECF 39 at 8; that SDC was denied "fundamental fairness" because the Commission was the only thing standing in the way of its compliance, *id.* at 10-11; that the Appeal Panel's decision to exclude certain newly proffered evidence was arbitrary, *id.* at 12; and that counsel representing the Panel had a conflict of interest that tainted the proceeding.  *Id.* at 13 n.4.

In my view, the College has fallen far short of persuading me that it is likely to succeed on the merits of Count I based on any of these additional arguments.  With respect to the compliance-deadline, for example, SDC is arguing in effect that the Commission acted capriciously when it *followed* its own policy, which limits extensions for good cause to one year.

*See*, *e.g.*, Withdrawal Letter, ECF 1-14 at 3.  The College's position is at odds with what the Fourth Circuit has said due process requires.  *See Professional Massage*, 781 F.3d at 172 ("When adjudicating common law due process claims against accrediting agencies, courts should focus primarily on whether the accrediting body's internal rules provided a fair and impartial procedure and whether it followed its rules in reaching the decision.").

With respect to SDC's argument that the Commission arbitrarily stood in the way of the College coming into compliance with Standard 3 by refusing to reaffirm accreditation, *see* ECF 39 at 10-11, again, the record shows that the Commission "provided a fair and impartial procedure" and "followed its rules in reaching" its decision.  SDC had notice of the rules and the reasons for the withdrawal decision, as well as an opportunity to respond to the Commission's concerns before the Commission acted.  Perhaps, *if* the Commission had believed SDC could accomplish its goals, and had reaffirmed accreditation, and *if* SDC had successfully sold its property, and *if* it had successfully entered into an Offer in Compromise with the IRS, and *if* it had successfully expanded enrollment or found some other source of revenue, then perhaps the College *would*, within a few years' time, have had ready access to the resources needed to satisfy Standard 3.  However, again, it is not this Court's job to assess the likelihood of all of that happening; it is the Commission's.  *See Professional Massage*, 781 F.3d at 171.  That is the point of the accreditation process.  *See id.* at 170 (accreditation "provides assurance that the federal loans and grants are awarded to students who will get the education for which they are paying").

Finally, SDC's arguments related to its Appeal Hearing are similarly unavailing.  The Panel's decision to exclude one of the four pieces of new evidence proffered at the hearing complied with the evidentiary rules promulgated by the USDE, *see* 34 C.F.R. § 602.20(h), and

by the Commission.  *See* Appeal Policy, ECF 15-5 at 4.  And, even if the Panel's attorney had a

conflict of interest, there is no indication that the Panel relied on her advice in any material way.

*See* Bascuas Testimony, ECF 47 at 144.  Accordingly, there is no evidence that the alleged

conflict had any effect on the Panel's decision.

## B.  Evidentiary Objections

As stated, at the hearing on SDC's PI Motion, the Commission introduced forty-eight

exhibits.  Many of the exhibits were simply copies of key documents that appear, sometimes

repeatedly, elsewhere in the record before me and before the Commission.  However, at the

Motion Hearing, the College objected to the admission of certain exhibits that it argued could not

be considered because they were not before the Commission when it decided to withdraw SDC's

accreditation.  *See* Motion Hearing, ECF 44 at 16-18, 24-27, 30-31, 50.  Counsel for the College

could not say for sure whether the evidence in question was before the Commission at the time

of its withdrawal decision.  *E.g.*, *id.* at 18.  Counsel for Middle States contended that he would,

through the course of the hearing, connect the evidence in question to the record before the

Commission through witness testimony.  *Id.* at 18-19.

Towards the end of the Motion Hearing, counsel for SDC narrowed his objections to

defendant's exhibits 3-5, 7-14, 16.  *See* Motion Hearing, ECF 47 at 200-201.  Counsel for

Middle States argued that SDC had "opened the door" to new evidence by introducing its own

new evidence, *id.* at 203-04; that, in any event, the exhibits should be considered because they

were relevant to "the claim of the college that they were meeting Standard 3 … ," *id.* at 202; that

they were relevant to my assessment of the credibility of Dr. Simmons's testimony, *id.* at 203-04;

and that if the Commission did not have them as part of the record, it is because SDC failed to provide them.[24]

As discussed above, and as I stated at the outset of the Motion Hearing, my role with respect to Count I is not to decide for myself whether SDC deserves accreditation, by conducting a *de novo* hearing.   It is to decide, *inter alia*, whether SDC was afforded due process. Accordingly, I have relied only on evidence relevant to the procedures Middle States employed and evidence relevant to the basis for its decision.   I have not considered defendant's Motion Hearing exhibits numbered 3-5, 7-14, and 16.

### B.  Motion to Dismiss Counts II and III

Middle States urges the Court to dismiss Counts II and III, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state  a claim.  MTD, ECF 27-1.[25]  With respect to Count III, for breach of contract, defendant argues the claim fails as a matter of law under the Fourth Circuit's reasoning in *Professional Massage*, *supra*, 781 F.3d at 181, because SDC has not adequately alleged the existence of a contract.   ECF 27-1 at 4-5.   Middle States also contends that "any facts pertaining to the formation, terms, performance, consideration, or enforcement of a purported contract" are "[n]oticeably absent" from the Complaint.   *Id*. at 5 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).  Further, Middle States argues that Count II, alleging violation of 42 U.S.C. § 1981, fails for the same reason, because the existence of a contractual interest is an element of the claim.   *Id*. at 5-6.  Alternatively, Middle States argues that Count II must be dismissed because SDC has not

---

[24] According to my notes, MSCHE advanced this argument on August 17, 2015.   As noted, I do not have a transcript for that date.

[25] The motion does not address Count IV (negligence).   Therefore, that count remains pending.

alleged facts sufficient to show plausibly that Middle States discriminated against it on the basis of race. *Id*. at 6-7. The College opposes the MTD (MTD Opposition, ECF 40), and Middle States replied (MTD Reply, ECF 45).

The Complaint does not specify in which state SDC believes the contract was formed, or otherwise clarify which State law applies. Based on the arguments put forth at the hearing on the PI Motion, it appears that the parties believe Maryland contract law applies.[26] As noted, the parties did not argue the MTD during the hearing conducted on the PI Motion.[27]

However, during the Motion Hearing, and after the parties completed briefing on the MTD, I asked Middle States to point the Court to those parts of the Complaint it believed showed SDC's failure to allege the existence of a contract. Counsel for Middle States responded that the only contract alleged is the accreditation relationship between SDC and Middle States. It also claimed that this claim fails as a matter of law because the Fourth Circuit made clear in *Professional Massage* that the accreditation relationship was not contractual under Virginia law; and that Maryland and Virginia law are the same in relevant part.

---

[26] The parties have not addressed choice of law. *See Chattery Int'l, Inc. v. Jo Lida, Inc.*, WDQ-10-02236, 2012 WL 14 54158, at *3 n.10 (D. Md. Apr. 24, 2012) ("Federal courts with supplemental jurisdiction over a state law claim apply the choice of law rules of the forum state."); *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011) (same). *See also Cleaning Auth., Inc. v. Neubert*, 739 F. Supp. 2d 807, 820 (D. Md. 2010) ("'Choice-of-law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes.'") (citation omitted). As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See*, *e.g.*, *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014).

[27] The Commission stated it believed the Court could decide the MTD based on the pleadings alone. The College stated it was not prepared to present arguments on the MTD, but it did not request a separate hearing or object to the Commission's request.

### 1.  Standard of Review

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the adequacy of a complaint.  To survive a Rule 12(b)(6) motion, a complaint must satisfy the pleading standard articulated in Fed. R. Civ. P. 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 & n.3 (2007).  That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement."  *Iqbal*, *supra*, 556 U.S. at 678 (internal citations omitted); *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).

To defeat a motion under Rule 12(b)(6), a complaint "must plead facts sufficient to show that [the] claim has substantive plausibility."  *Johnson v. City of Shelby, Miss*., ____ U.S. ____, 135 S. Ct. 346, 347 (2014); *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . .") (citation omitted); *Twombly*, 550 U.S. at 570; *see also Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 320 (4th Cir. 2012); *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown that "'the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (citation omitted).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.

2011), *cert. denied*, ____ U.S. ____, 132 S. Ct. 402 (2011).   The complaint must contain

sufficient factual detail to "nudge[ ] [the plaintiff's] claims across the line from conceivable to

plausible." *Twombly*, 550 U.S. at 570; *accord Iqbal*, 556 U.S. at 680.

Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint

and viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a

claim to relief . . . .'" *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation

omitted).   But, the court need not accept unsupported or conclusory factual allegations devoid of

any reference to actual events.   *See Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

Nor must it accept legal conclusions couched as factual allegations, *Iqbal*, 556 U.S. at 678, or

legal conclusions drawn from the facts.   *See Papasan v. Allain*, 478 U.S. 265, 286 (1986);

*Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 559 U.S.

992 (2010).

## 2.  Count III (Breach of Contract)

According to SDC, *see* ECF 40 at 4, the Complaint sufficiently alleges a breach of

contract, as follows, ECF 2:

> 82.  By applying to receive accreditation from MSCHE and MSCHE's
> agreement to undertake the accreditation process, [SDC] and MSCHE formed a
> valid contract.
>
> 83.  Through the acts set forth above, MSCHE has breached the contract
> by failing to apply its standards in a way consistent with the warning notice it
> earlier provided to the College.  By departing from the terms of the expectations
> of [SDC] articulated in those warning terms in order arbitrarily to find an [sic]
> level of performance by [SDC] to be lacking, MSCHE breached its contract with
> [SDC] to perform its oversight in a fair and even-handed manner.   Such
> performance, MSCHE failed to provide.

At paragraph 74, the Complaint alleges that the College "operates within a contractual relationship with" the Commission.  It adds:  "In exchange for the fees it pays", the College "secures the accrediting agency's good faith oversight of its operation and certification of that operation to third parties such as students and the USDE."  *Id.*

As stated, in its MTD Middle States argues that, under the reasoning of *Professional Massage*, *supra*, the accreditation relationship is not a contractual relationship, as a matter of law.  Specifically, the Commission contends, ECF 27-1 at 4:

> The Fourth Circuit has recently held that application for accreditation and use of accreditation standards do not create a binding contract between the accrediting agency and the educational institution.  [*Professional Massage*, 781 F.3d at 181.]  Specifically, accreditation standards "do not constitute a binding contract between the agency and the accredited educational institutions because the [commission] can alter the alleged 'contract' at will, and, thus, is not bound by its terms."  *Id.*[1]  "[The accreditation body has] an unquestionable right to revoke [a school's] accreditation if compliance with the Standards was not demonstrated. Exercising one's lawful rights is not a breach of contract."  *Id.* at 181.  In fact, a school does not 'apply' to 'join' an accreditation agency.  Instead a school 'want[s] a key that would unlock the federal Treasury.  An accrediting agency is a proxy for the federal department whose spigot it opens and closes."  *Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Sch. & Colleges*, 44 F.3d 447, 449 (7th Cir. 1994).

Middles States also maintains that the Complaint fails sufficiently to allege the existence of a contract because it lacks "any facts pertaining to the formation, terms, performance, consideration, or enforcement of a purported contract".  *Id.* at 5.

In response, SDC argues, in effect, that Middle States reads *Professional Massage* too broadly.  SDC correctly observes that the Fourth Circuit's reasoning, although broadly stated, was specifically applied to the terms of different accreditation standards set by a different accrediting agency at issue in the case *sub judice*, and under a different State's common law.  *See* ECF 40 at 6; *see also Professional Massage*, 781 F.3d at 181.  SDC further argues that it "does

not contend that the denial of accreditation constitutes a breach of contract.  Rather, it reads an implied covenant of good faith in the 'contractual relationship' alleged between the parties and contends that other than even-handed treatment of [SDC] by MSCHE constitutes a breach." ECF 40 at 6.

In reply, the Commission argues that "the law in Maryland and Virginia are [sic] identical" with respect to the "basic, fundamental point of contract law" relied upon in *Professional Massage*.  ECF 45 at 2.  Moreover, in response to SDC's explanation that the Complaint alleges Middle States breached an implied covenant of good faith, *see* ECF 40 at 6, Middle States argues that "Maryland law does not recognize an independent cause of action for breach of the implied contractual duty of good faith and fair dealing."  ECF 45 at 2 (citing cases).

In my view, SDC is correct that the Commission reads *Professional Massage* too broadly.  *Professional Massage* does not say that any breach of contract claim brought by an institution of higher education against an accrediting agency on the basis of the accreditation relationship fails as a matter of law.  Rather, it said that the specific terms of the defendant-agency's accreditation standards made clear that the agency "had an unquestionable right to revoke" an institution's accreditation "if compliance with the Standards was not demonstrated." 781 F.3d at 181.

Nonetheless, the Commission is also correct that the Complaint does not plausibly allege the existence of a contract, or "any of the necessary bases for a breach of contract claim."  ECF 27-1 at 5.  Under Maryland law, it is "'well-established'" that "'a complaint alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'"

*RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 655, 994 A.2d 430, 440 (2010) (quoting *Continental Masonry Co. v. Verdel Construction Co.*, 279 Md. 476, 480, 369 A.2d 566, 569 (1977)) (emphasis in original).  Further, it "is universally accepted that a manifestation of mutual assent is an essential prerequisite to the creation or formation of a contract."  *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007).  "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms."  *Id*.

Here, the Complaint fails to allege facts that plausibly show the parties agreed to any particular terms, and/or that the parties intended to be bound by the unidentified terms, and/or that Commission breached a particular one of the unidentified terms.  Indeed, the College conceded in its response that the Complaint does not allege breach of any particular term of the "contract":  SDC argues only that it is relying on an implied covenant of good faith, without explaining *what* contractual term or promise Middle States failed to perform in good faith.  *See* ECF 40 at 6.  At best, the Complaint alleges that Middle States was supposed "to perform its [accreditation] oversight in a fair and even-handed manner", and that Middle States "failed to provide" "[s]uch performance".  ECF 2 ¶ 84.  Although it is conceivable that an accrediting agency could contract to perform accreditation, the Complaint does not contain sufficient factual detail to "nudge" SDC's claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Accordingly, I will grant defendant's motion to dismiss Count II.  But, I will grant plaintiff leave to amend the Complaint, provided that any amended complaint alleges a specific contract, oral or written, with definite terms mutually agreed to by the parties.

### 3.  Count II (42 U.S.C. § 1981)

As stated, the Commission argues, *inter alia*, that Count III of the Complaint also fails to state a claim upon which relief may be granted, because it fails to allege sufficiently the existence of a contract.  ECF 27-1 at 5-6.

Section 1981(a) of Title 42 provides, in part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens … .

Subsection (b) further defines what it means to "make and enforce contracts."  It provides:  "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  Subsection (c) states that the "rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."

Generally, to state a § 1981 claim, the plaintiff must show that "he or she is a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities protected by the statute."  *Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 734 (D. Md. 2001).  Thus, "[t]o prove a § 1981 claim ... a plaintiff must ultimately establish both that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest."  *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 434 (4th Cir. 2006).  As to the latter requirement, "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the

existing (or proposed) contract that he wishes 'to make and enforce.'" *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479-80 (2006).

In this case, I have already determined that the Complaint does not plausibly allege the existence of a contract. For the same reason, the Complaint fails to state a claim for relief under § 1981. Accordingly, I will grant defendant's motion to dismiss Count II, with leave to amend the Complaint, provided that any amended complaint alleges a specific contractual interest.

## Conclusion

Sojourner-Douglass College, its faculty, and alumni have much for which to be proud. As put by a Maryland State Senator, for example, SDC's "impact on the lives of families and communities in Baltimore city and the surrounding counties has not gone unnoticed." Record of Appeal, Def.'s Ex. 45 at 3107 (letter dated Aug. 18, 2014 from Md. Sen. Joan Carter Conway to Dr. Simmons). Similarly, U.S. Representative Elijah Cummings said in a letter to the Commission dated June 24, 2015, ECF 1-4:

> For more than 40 years Sojourner-Douglass has served thousands of Marylanders with a quality education. This is a unique institution, begun from a heartfelt, grassroots effort to better the conditions of African American adults who had given up all hope of attending college … . Sojourner gave so many a renewed hope that they could rise above what others had determined they could be, and what they even believe about themselves.

To be sure, the College met the Commission's Standards with respect to the quality of its programs and teaching. Nonetheless, federal regulations oblige the Commission to enforce financial standards designed to ensure that SDC, like any other accredited institution, can afford to keep its doors open long enough for current and newly entering students to complete their degrees. *See* Klinman Testimony, ECF 44 at 124 ("The purpose of the financial standards is … assurance that when a student enrolls in a program … , that there is evidence of financial

wherewithal so that the student has … the opportunity to complete [the] educational program, because students frequently incur indebtedness … to undertake [the] program, and should the institution not have sufficiently solid financial bases, that institution may not be able to award that degree three years down the road, five years down the road.").

Perhaps most important, the question before me is a narrow one:  Is the College likely to succeed on its claim that the Commission failed to afford the College due process in the manner of its enforcement of its standards.  For the reasons discussed above, I am of the view that the College is not likely to succeed on the merits.  Therefore, I will deny SDC's motion for preliminary injunction (ECF 11).

Further, for the reasons discussed, *supra*, I will grant the MTD (ECF 27), without prejudice, and with leave to amend.

A separate Order follows, consistent with this Memorandum.


Date:   August 27, 2015                        _____/s/_____
                                                Ellen Lipton Hollander
                                                United States District Judge